**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JEVON PEOPLES, *Plaintiff*, v. WHOLE FOODS MARKET, INC. *Defendant.* | Case No.: 1:23-cv-04359<br>Judge Thomas M. Durkin |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Heidi Karr Sleper
Thalia Pacheco
Workplace Law Partners P.C.
155 N. Michigan Ave, Suite 719
Chicago, Illinois 60601
(312) 861-1800
hsleper@fishlawfirm.com
tpacheco@fishlawfirm.com
docketing@fishlawfirm.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

**Page**


INTRODUCTION ........ 1

STATEMENT OF MATERIAL FACTS ........ 1

SUMMARY JUDGMENT STANDARD ........ 5

ARGUMENT ........ 7

**I. PLAINTIFF HAS PRESENTED SUFFICIENT EVIDENCE OF RACE DISCRIMINATION UNDER TITLE VII AND THE IHRA** ........ 7

A. The Evidence, Viewed Holistically Under *Ortiz*, Supports an Inference of Discrimination........ 7

B. There is a Genuine Issue of Material Fact Regarding the Elements of the Prima Facie Case ........ 13

C. A Jury Could Find That Plaintiff Was Meeting Legitimate Job Expectations........ 14

D. Plaintiff Has Identified Valid Comparators........ 17

E. Substantial Evidence of Pretext Exists ........ 19

**II. PLAINTIFF HAS PRESENTED SUFFICIENT EVIDENCE OF RETALIATION** 21

**III. PLAINTIFF'S RETALIATORY DISCHARGE CLAIM SURVIVES** ........ 23

CONCLUSION........ 24

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 979 (7th Cir. 2014) .......... 13
*Altwasser v. Am.'s Auto Body, Inc.*, No. 21-CV-2524, 2024 WL 1798778, at *10–11 (N.D. Ill. Apr. 25, 2024 .......... 15, 19
*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986) .......... 5, 6
*Bay v. Cassens Transport Co*., 212 F .3d 969, 972 (7th Cir. 2000) .......... 6
*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) .......... 5
*Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 916 (7th Cir. 2010). .......... 18
*Coleman v. Donahoe*, 667 F.3d 835, 846–47 (7th Cir. 2012) .......... 17, 18
*Cty of Kankakee v. Illinois Fraternal Ord. of Police Lab. Council*, 2014 IL App (3d) 130662-U, ¶ 22 .......... 24
*Curry v. Menard, Inc.,* 270 F.3d 473, 478 (7th Cir. 2001) .......... 15
*Flanagan v. Off. of Chief Judge of Cir. Ct. of Cook Cnty., Ill.*, No. 06 C 1462, 2007 WL 2875726, at *8 (N.D. Ill. Sept. 28, 2007) .......... 13
*Fragassi v. Neiburger*, 269 Ill. App. 3d 633, 638 (1995) .......... 23
*Geary v. Telular Corp*., 341 Ill. App. 3d 694, 700-01 (2003) .......... 23
*Goelzer v. Sheboygan Cnty., Wis.*, 604 F.3d 987, 995 (7th Cir. 2010) .......... 22
*Gordon v. United Airlines, Inc*., 246 F.3d 878, 889 (7th Cir. 2001) .......... 11, 12, 15, 20
*Hasham v. California State Bd. of Equalization*, 200 F.3d 1035, 1045 (7th Cir. 2000) .......... 16
*Huff v. Buttigieg,* 42 F.4th 638 (7th Cir. 2022) .......... 8, 17
*Igasaki v. Illinois Dep't of Fin. and Prof'l Regulation*, 988 F.3d 948, 957 (7th Cir. 2021) .......... 6
*Insolia v. Philip Morris, Inc*., 216 F.3d 596, 599 (7th Cir. 2000) .......... 5
*Ismail v. Brennan*, 654 F. App'x 240, 245 (7th Cir. 2016) .......... 15
*James v. Sheahan*, 137 F.3d 1003, 1007 (7th Cir. 1998)) .......... 15, 20
*Johnson v. Advocate Health & Hosps. Corp*., 892 F.3d 887, 893 (7th Cir. 2018) .......... 6, 17
*Lesiv v. Illinois Cent. R.R.* Co., 39 F.4th 903, 918-19 (7th Cir. 2022) .......... 17, 18
*Lewis v. City of Union City*, 918 F.3d 1213, 1227–28 (11th Cir. 2019) .......... 17
*Lewis v. School Dist. #70*, 523 F.3d 730, 741 (7th Cir. 2008) .......... 23
*Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315–16 (7th Cir. 2011) .......... 22
*Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 355 (2024) .......... 14
*Mundo v. City of Chi.*, No. 20 C 2562, 2023 WL 3568592, at *12 (N.D. Ill. May 18, 2023) .......... 6
*O'Neal v. City of New Albany*, 293 F.3d 998, 1003 (7th Cir. 2002) .......... 13
*Oest v. Ill. Dep't of Corr*., 240 F.3d 605, 612 n. 3 (7th Cir.2001) .......... 13
*O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 985 (7th Cir.2001) .......... 16, 18
*Ortiz v. Werner Enters., Inc*., 834 F.3d 760, 766 (7th Cir. 2016) .......... 6, 7
*Palmateer v. Int'l Harvester Co*., 85 Ill. 2d 124, 132-34 (1981) .......... 24
*Perdomo v. Browner,* 67 F.3d 140, 145 (7th Cir. 1995) .......... 20

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) .................................... 20
*Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 723 (7th Cir. 2005) ................................. 7, 20
*Runkel v. City of Springfield*, 51 F.4th 736, 741-42 (7th Cir. 2022)............................................ 6
*Sanchez v. Henderson*, 188 F.3d 740, 746 (7th Cir. 1999).................................................. 15, 20
*Scruggs v. Garst Seed Co.*, 587 F.3d 832, 838 (7th Cir.2009) .................................................. 18
*Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285, 290 (7th Cir. 1999) ..................................... 12, 15
*Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021) ................................ 6
*Vichio v. US Foods, Inc.,* 88 F.4th 687, 691 (7th Cir. 2023) ..................................................... 16
*Whitmore v. Nat'l R.R. Passenger Corp.,* 510 F. Supp. 3d 295, 304 (E.D. Pa. 2020).................. 13

**Statutes**

Fed. R. Civ. P. 56(c) ..................................................................................................... 8

## INTRODUCTION

This case is about whether Whole Foods selectively enforced its timekeeping policy, exaggerated minor conduct into a "major infraction," and used it as a pretext to terminate a long term African American employee who had engaged in protected activity and recently exercised his FMLA rights. When the record is viewed in the light most favorable to Plaintiff, as required at summary judgment, a reasonable jury could conclude that Defendant's proffered explanation is not worthy of belief and that discrimination and retaliation were motivating factors in Plaintiff's termination. Genuine disputes of material fact permeate the record as to comparator treatment, the meaning and application of Whole Foods' policies, the role of Store Team Leader Kristi Malicoat and ASTL Frank Gaughan in the termination process, and whether the stated reason for termination was pretextual.

## STATEMENT OF MATERIAL FACTS

Plaintiff incorporates by reference his Response to Defendant's Local Rule 56.1 Statement of Facts and Statement of Additional Facts. Those filings establish numerous disputed facts, including but not limited to the following:

Plaintiff, Jevon Peoples, began working for Whole Foods in 2004 as a cashier, and over the course of nearly eighteen years, he advanced through the organization and ultimately served as Lead Receiver at the Chicago Gold Coast store. RDF ¶¶2, 4, 6.[1] Under Peoples' leadership, the Receiving Department at the Gold Coast store was successful and consistently passed regional audits. (PF ¶1). Management believed that he did his job well, was a hard worker, and knew his job thoroughly. (PF ¶2). Peoples was entrusted by regional leadership to help other store locations with new openings and to support stores that lacked a receiving department. (PF ¶3). In 2019, he

[1] Plaintiff's Response to Defendant's Local Rule 56.1 Statement of Facts is referred to herein as RDF ¶__. Plaintiff's Additional Statement of Facts are referred to as PF ¶__.

was also one of four employees (out of approximately 250) nominated for the "Team Member of the Year" award. (PF ¶4). In his last annual performance review (six months before his termination), Mr. Peoples's overall score was in the "Exceeds Standards" category, which is the highest rating an employee can receive, and he had no warnings or disciplinary notations. (PF ¶5).

From 2018 until late 2021, Mr. Peoples's supervisors were Store Team Leader ("STL") John Edwards and Associate Team Leader ("ASTL") Juan Contreras. (RDF ¶¶6-7). In late 2021, Kristina Malicoat became the Store Team Leader at the Defendant's Gold Coast store. (RDF ¶7). In April 2022, the Gold Coast store moved to a new building. (PF ¶12).

The Gold Coast leadership team was predominantly non-Black. (PF ¶13). When the Gold Coast store moved to its new building, there was a pre-opening ceremony where STL Malicoat gave a speech and thanked all of the store's teams, with the exception of the Receiving Department, the team led by Mr. Peoples. (PF ¶12). Mr. Peoples believed that the differential treatment he received from STL Malicoat was due to race. Along with leaving him out of the speech, STL Malicoat also excluded Mr. Peoples from the Team Member meetings that he had been invited to attend in the past. (RDF ¶71).

Following the move to the new building, Plaintiff began raising concerns to management about workplace safety conditions in the Receiving Department. (PF ¶6). Beginning around September 23, 2022, he raised additional safety concerns to STL Malicoat. (PF ¶6). After Plaintiff raised these issues, Malicoat began characterizing him as resistant to feedback and change, describing his use of the term "safety" as a way to strengthen his objections rather than as legitimate concerns. (PF ¶¶9, 11).

Due to STL Malicoat's mistreatment of Plaintiff, in November 2022, he approached ASTL Frank Gaughan, who was his direct supervisor, and complained that STL Malicoat was treating

him differently, and Gaughan advised him to address the issue directly with Malicoat. (PF ¶14). Thereafter, still in November, Mr. Peoples approached STL Malicoat and told her that he felt that she was mistreating him because he was a Black man in a lead role. (PF ¶14). STL Malicoat did not deny his allegations and instead responded, "I don't like you." (PF ¶14, RDF ¶62). Also in the fall of 2022, Plaintiff submitted a Compass Survey to Defendant, and in that survey, he raised concerns that there was a lack of Black employees in leadership positions at the store. (RDF ¶68).

Following Plaintiff's protected activity of reporting safety concerns and raising discrimination complaints, towards the end of November 2022, Plaintiff's schedule was modified without his knowledge. (PF ¶15). This practice was unusual, given that Defendant's practice is to ask employees prior to making any changes. *Id.* Regardless, because of this, Plaintiff was unaware that he had to come in on a day that he was normally off, and he received a disciplinary write-up for this. *Id.*

Mr. Peoples had approved FMLA leave for his minor child's serious health condition. During the holiday season, Defendant had a blackout period where employees were not allowed to take time off. Mr. Peoples took FMLA time from December 12, 2022 to December 16, 2022, which happened to coincide with the blackout period. (PF ¶16). This was the first time since STL Malicoat became his supervisor that he took more than two consecutive FMLA days. *Id*.

While Plaintiff was out on FMLA leave, or two weeks before December 30, 2022, STL Malicoat, ASTL Gaughan, and another ASTL met to discuss a list of things that they wanted to raise with Plaintiff and to conduct some retraining, particularly, they wanted to raise the fact that he was not taking his lunch breaks. (PF ¶17). Plaintiff sometimes did not take his lunch break because workload was too much, and he was unable to take a lunch, also receiving operations

involved time-sensitive perishable deliveries that delaying processing could cause spoilage. (PF ¶22).

On December 28, 2022, approximately 12 days after Mr. Peoples returned from FMLA leave, STL Malicoat sent a series of emails, starting at 7:31 a.m., to Team Member Services (HR) and store leadership raising complaints about Plaintiff's performance, including his use of incense, him being out of uniform, being resistant to change, leaving early and not taking lunch breaks. (PF ¶18). Following Malicoat's emails, Gaughan initiated an investigation into Plaintiff, which he alleged was triggered by the fact that Plaintiff had clocked out early that day. (PF ¶¶19, 20; RDF ¶19). However, on December 28, Plaintiff's shift ended at 1:00 p.m., and he clocked out at 1:09 p.m. (PF ¶20). Gaughan's investigation included reviewing video footage and Plaintiff's time-clock records. (RDF ¶19).

After reviewing time punches, Gaughan noted that Plaintiff had not taken lunch breaks during portions of the week and reviewed video footage to assess Plaintiff's movements after clocking in. (RDF ¶19). Plaintiff was entitled to take two unpaid, 10-minute breaks if he worked six or more hours. (PF ¶30). Plaintiff would take his break to move his car after punching in to avoid being late (RDF ¶28), as there were instances where he was late due to caring for his sick child the night before. (PF ¶29). Before moving his car, Plaintiff routinely began working upon arrival by performing receiving duties, including retrieving empty carts or u-boats and organizing pallets, cardboard, or other materials for removal. (PF ¶31). After performing this work, Plaintiff would take his first authorized 10-minute break to move his car. (PF ¶36). In addition, both before and after moving his car, Plaintiff at times performed other work-related tasks, such as communicating with the building dock manager regarding anticipated deliveries and bringing in or handling packages and overnight deliveries from the prior day, before resuming his duties and

returning to his primary work area. (PF ¶31). Plaintiff was never counseled, warned, or disciplined for this practice. (PF ¶36).

On December 29, 2022, Plaintiff was placed on unpaid suspension. On December 30, 2022, Whole Foods terminated Plaintiff's employment. (RDF ¶49). Defendant contends that Plaintiff was terminated solely for misrepresentation of time. (PF ¶28). Generally, violating the break policy and taking a break at the beginning or end of a shift, would be handled with progressive discipline, which starts with a verbal warning or coaching and then progresses through various levels of escalating corrective action up to the end of employment. (PF ¶35). Defendant did not follow any of these procedures in terminating Mr. Peoples. (PF ¶36).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In seeking a grant of summary judgment, the moving party must identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This initial burden must be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the nonmoving party's case." *Id.* at 325. A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000).

The court must consider the evidence in a light most favorable to the non-moving party, and draw all reasonable inferences that favor the non-moving party. *Anderson*, 477 U.S. at 255;

*see also Bay v. Cassens Transport Co*., 212 F .3d 969, 972 (7th Cir. 2000). A plaintiff may offer direct and/or circumstantial evidence of discrimination, and "all evidence belongs in a single pile and must be evaluated as a whole." *Igasaki v. Illinois Dep't of Fin. and Prof'l Regulation*, 988 F.3d 948, 957 (7th Cir. 2021), *quoting Ortiz v. Werner Enters., Inc*., 834 F.3d 760, 766 (7th Cir. 2016).

"On summary judgment, a court may not weigh the evidence or decide which inferences should be drawn from the facts." *Mundo v. City of Chi.*, No. 20 C 2562, 2023 WL 3568592, at *12 (N.D. Ill. May 18, 2023). Credibility determinations, weighing of evidence, and drawing legitimate inferences from the facts are jury functions, not those of a judge deciding summary judgment. *Anderson*, 477 U.S. at 255. In *Runkel v. City of Springfield*, 51 F.4th 736, 741-42 (7th Cir. 2022), the Seventh Circuit reiterated the Court's limited role when considering a motion for summary judgment:

> On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder. Rather, the court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial. Summary judgment is not appropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. We must look therefore at the evidence as a jury might, construing the record in the light most favorable to the nonmovant and avoiding the temptation to decide which party's version of the facts is more likely true. As we have said many times, summary judgment cannot be used to resolve swearing contests between litigants. *Johnson v. Advocate Health & Hosps. Corp*., 892 F.3d 887, 893 (7th Cir. 2018) (reversing summary judgment). We "do not weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc*., 14 F.4th 757, 760 (7th Cir. 2021).

*Runkel*, 51 F.4th at 741-42.

# ARGUMENT

## I. PLAINTIFF HAS PRESENTED SUFFICIENT EVIDENCE OF RACE DISCRIMINATION UNDER TITLE VII AND THE IHRA

### A. The Evidence, Viewed Holistically Under *Ortiz*, Supports an Inference of Discrimination

Under *Ortiz v. Werner Enterprises, Inc*., the Court must consider all evidence together and ask whether a reasonable jury could conclude that Plaintiff's race caused his termination. 834 F.3d 760, 765–66 (7th Cir. 2016). Here, the totality of the evidence includes: (1) hostile treatment by Malicoat following Plaintiff's protected activity and FMLA leave; (2) selective and unusually harsh enforcement of a timekeeping rule; (3) disputed comparator evidence; and (4) shifting and exaggerated characterizations of Plaintiff's conduct. Taken together, this evidence supports a triable inference of discriminatory intent.

#### i. There is a Disputed Issue of Fact as to Whether Kristina Malicoat Initiated the Termination of Plaintiff

Defendant argues that Plaintiff cannot show racial bias, arguing that the decision-maker in his termination was not STL Malicoat, but this is a disputed issue, and regardless, she can be implicated because her actions are the proximate cause of Mr. Peoples's termination. The ultimate question in discrimination cases is whether the decision was based on an illegal factor. *See Rudin v. Lincoln Land Cmty. Coll*., 420 F.3d 712, 723 (7th Cir. 2005) ("It is true that it is the motivation of the decisionmaker that matters in the Title VII context."). Even if the ultimate termination decision was subject to higher-level HR approval, Whole Foods cannot evade liability by interposing a formal decision-maker with a clean record.

Whether Malicoat's discriminatory animus was the motivation for her initiating disciplinary action and investigation into Plaintiff is a disputed issue of fact for the jury to decide. The evidence shows that Plaintiff accused STL Malicoat of discrimination. (PF ¶14). Specifically,

in November 2022, Plaintiff complained to Associate Store Team Leader Frank Gaughan about the differential treatment that he experienced from Store Team Leader Malicoat and Gaughan advised him to try to work it out with her, so Plaintiff approached Malicoat and during this interaction he told her that he felt she was mistreating him because he's a Black man in a lead role, which she did not deny. *Id.* Then, around April 2022, the Gold Coast store moved to a new building. (PF ¶12). There was a pre-opening ceremony of the new Gold Coast location, and during this event, Store Team Leader Malicoat gave a speech where she thanked all of the store's teams, with the exception of the Receiving Department. *Id.* During the relevant period, the Gold Coast store's leadership team was composed primarily of White, non-Black Associate Store Team Leaders and Team Leaders. (PF ¶13). Malicoat then set in motion the investigation leading to termination. (PF ¶¶17-18).

Under the cat's paw doctrine, an employer is liable if a biased subordinate's actions are the proximate cause of the adverse action, even if the ultimate decision-maker lacks personal animus. In *Huff v. Buttigieg,* 42 F.4th 638 (7th Cir. 2022), for example, the Seventh Circuit reversed summary judgment where a supervisor's retaliatory intent influenced the plaintiff's firing, emphasizing that an employer may be held liable if a subordinate's animus proximately caused the termination. *Id*. at 647.

Here, a jury could conclude that Malicoat's hostility toward Plaintiff (due to his discrimination and safety complaints and inconvenient medical leave) tainted the process. Notably, Malicoat was involved in the initial meeting that was held while Plaintiff was on leave to address that Plaintiff was not taking his lunch breaks[2]. (PF ¶17). Malicoat initiated the HR complaints

[2] Store leadership was responsible for auditing employees' attendance records daily, which showed when employees punched in and out, including for breaks. (PF. ¶23). From these audits, it was known that Plaintiff would not always take a lunch break (and even former STL Edwards was aware) (PF ¶24), so the fact that Malicoat chose to act on this issue, while he was on FMLA and after his protected activity is nothing short of

against Plaintiff. Specifically, on December 28, 2022, beginning at approximately 7:31 a.m. and continuing throughout the day at 2:22 p.m., 2:36 p.m., and 2:39 p.m., Store Team Leader Kristina Malicoat sent four staggered emails to Team Member Services (HR) and store leadership raising complaints regarding Plaintiff's performance. (PF ¶18). Malicoat's complaints included lighting incense, which was not a policy violation and Plaintiff had been lighting incense for years, and alleged dress code violations, for which Plaintiff was never disciplined. (PF ¶¶18, 25, 37). ASTL Gaughan testified that he then proceeded to review video footage of Plaintiff because he and Malicoat had planned to speak with Plaintiff, but he was not there when they were going to approach him. (PF ¶19). Plaintiff's shift that day ended at 1:00 p.m., and he punched out *after his shift ended* at 1:09 p.m. (PF ¶20). Gaughan admitted that there was nothing suspicious about Mr. Peoples leaving at the end of his shift. (PF ¶20). Therefore, there was no reason for Gaughan to start reviewing video footage of Plaintiff, and his declaration and deposition testimony stating Plaintiff left early, and that's why he began investigating him were disingenuous. (PF ¶20; RPF ¶19). Thus, Malicoat's actions directly led to Plaintiff's suspension and firing. Under cat's paw principles, any retaliatory or discriminatory animus on the part of Malicoat can be attributed to Whole Foods because her machinations were the "intended consequence" that proximately caused Plaintiff's termination.

Defendant further argues that Plaintiff cannot show racial animus because he "admits that he engaged in the conduct which ultimately resulted in his termination." (Def's Mot., at p. 4). However, where Plaintiff admitted to conduct, which is not a major infraction, (RDF ¶33) and to which many others have admitted to as well without discipline, (RDF ¶¶53-55), the issue is

---

coincidental. Even more telling, Malicoat testified that she was also "looking into other Team Leaders" who were not taking breaks, but when asked who these individuals were, she was unable to identify them. (PF ¶21).

whether Whole Foods selectively enforced its timekeeping policy, exaggerated minor conduct into a "major infraction," and used it as a pretext to terminate an African American employee who had engaged in protected activity and recently exercised his FMLA rights. Plaintiff was not aware that taking his break at the beginning of his shift was an issue since management had never raised this with him, and he treated the time he spent moving his car as his authorized 10-minute break. (PF ¶36). STL Edwards testified that it was not a requirement that team members explain why they were late. (RDF ¶31).

Defendant asserts that it fired Mr. Peoples solely for "misrepresentation of time," specifically, for allegedly taking an unauthorized break at the start of his shift in violation of company policy. (PF ¶28). However, the policy in question was inconsistently applied and the evidence shows that the policy was more rigidly applied to Black employees than to White employees. While Whole Foods' General Information Guide (GIG) states that a break may not be taken at the very beginning of a shift (RDF ¶33), crucially, the GIG nowhere defines when a shift "begins," nor how long one must work before taking a break. (PF ¶30). Store leadership themselves gave conflicting testimony on this point – one former Store Team Leader was "uncertain if the GIG even says anything about taking a break at the beginning of a shift." *Id*. Additionally, this is not listed as a major infraction. (RDF ¶¶33, 58). Per the GIG book, misrepresentation of time "may lead to discharge," but it's not grounds for immediate termination. (PF ¶27).

In Mr. Peoples's case, the record shows he often would start working immediately upon clocking in (e.g., handling deliveries, retrieving empty carts or u-boats and organizing pallets, cardboard, or other materials for removal), take only a brief interlude to move his car, and then promptly resume work. (PF ¶31). If that routine is construed as taking a "break" at shift start, it was a practice management had never previously warned him against or disciplined Plaintiff for.

The first and only time this nebulous rule was enforced against him, termination without warning, coincided with his protected FMLA leave and complaints, which is hardly a coincidence.

Defendant's discipline policy applies equally across the board. (PF ¶34). Violating a break policy and taking a break at the beginning or end of a shift is not a major infraction and is normally handled with progressive discipline. (PF ¶35). Progressive discipline starts with a verbal warning or coaching and then progresses through various levels of escalating corrective action up to the end of employment. *Id*. Defendant did not follow any of these procedures in terminating Mr. Peoples.

In contrast to Mr. Peoples, the following non-Black employees engaged in comparable or more serious conduct but were not terminated: Team Leader Misael Martinez engaged in sexual harassment that included stalking and was then transferred to the Gold Coast store. (PF ¶39). Martinez was involved in at least one or more incidents of sexual harassment, but he was not terminated. He left on his own (*Id.*); Carlos Celis was accused of sexual harassment by multiple women and was reported for this to Defendant by both Edwards and Malicoat, and he also was not let go (PF ¶40); Employees Carlos Celis, Misael Martinez, Receiver Arnold Cavazos, and Gloria Morales would take breaks at the beginning of their shifts to go grab coffee or donuts, and they were not terminated (RDF ¶¶53-55, 57); Team Leader Wally Colon caused Defendant to lose significant amounts of money due to meat spoilage and was not let go. (RDF ¶61).

The Seventh Circuit has held that when an employer suddenly invokes a rarely enforced or ambiguous rule to terminate an employee, a factfinder can reasonably infer pretext. In *Gordon v. United Airlines, Inc*., 246 F.3d 878, 889 (7th Cir. 2001), for instance, the employer fired a plaintiff for violating a work rule that was rarely invoked and the court found enough evidence of pretext to overturn summary judgment. ("Our review of the record reveals inconsistencies in definition

and disparities in application that call into question United's proffered justification and make summary judgment inappropriate.”). There, the Seventh Circuit questioned United’s characterization of the plaintiff’s conduct as a more serious infraction than it did for other employees. *Id*. at 891. The Seventh Circuit stated, “we are not bound by the labels that an employer uses and must scrutinize the conduct behind those labels to determine if they are applied to similar conduct.” *Id*. In this case, the Court should scrutinize that Whole Foods labeled Plaintiff’s conduct as “misrepresentation of time,” where the conduct is considered a less severe violation of the break policy for other employees. Likewise, in *Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285, 290 (7th Cir. 1999), the Seventh Circuit doubted that eating a co-worker’s open bag of chips truly violated company policy and noted the imbalance of the “severity of the punishment in relation to the alleged offense,” famously likening the firing to “swatting a fly with a sledgehammer.” *Id.* Here, Whole Foods’ break rule is at least as ambiguous as the policies in *Gordon* and *Stalter*, and the punishment is even more disproportionate.

The GIG’s silence on what constitutes the “beginning” of a shift gave management unfettered discretion to label Plaintiff’s break to move his car a terminable offense, while ignoring the dozens of other employees who took breaks in the morning to get Dunkin or have a cigarette. And terminating a veteran employee with an “exceeds standards” performance record for this minor infraction is akin to using a sledgehammer on a fly. A reasonable juror could conclude that Whole Foods seized on this obscure rule as a pretext to mask retaliation or discrimination. Indeed, Defendant’s own witnesses admit that normally such a minor break timing issue would be handled with progressive discipline, not immediate firing. Had standard policy been followed, Mr. Peoples would have received a warning at most, but, instead, he was summarily terminated. This stark deviation from normal practice is classic evidence of pretext.

### B. There is a Genuine Issue of Material Fact Regarding the Elements of the Prima Facie Case

Alternatively, Defendant argues that Plaintiff cannot make a prima facie case of race discrimination under *McDonnell Douglas*.[3] The McDonnell Douglas prongs do not assist in the analysis where the people judging the Plaintiff's performance are the same people accused of discriminating against him. *See Oest v. Ill. Dep't of Corr*., 240 F.3d 605, 612 n. 3 (7th Cir.2001). At the summary judgment stage, Plaintiff is not required to prove the prima facie case elements of his case; rather, Plaintiff needs only to show that there is a genuine issue of material fact regarding these elements. *See O'Neal v. City of New Albany*, 293 F.3d 998, 1003 (7th Cir. 2002). To establish a prima facie case, Plaintiff must show that he (1) is a member of a protected class; (2) was meeting his employer's legitimate expectations; (3) suffered an adverse employment action; and (4) at least one similarly situated employee, not in his protected class, was treated more favorably. *See Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 979 (7th Cir. 2014). "The plaintiff's burden at this stage is not onerous, as the goal is to eliminate the most common nondiscriminatory reasons for the defendant's actions; by doing so, the prima facie case creates an inference that the defendant's actions were discriminatory." *Whitmore v. Nat'l R.R. Passenger Corp.,* 510 F. Supp. 3d 295, 304 (E.D. Pa. 2020) (internal quotations omitted).

#### i. Defendant Takes Too Narrow of a View of the Adverse Actions Plaintiff Suffered

The question of whether an employment action is adverse is fact-specific, and context matters. *Flanagan v. Off. of Chief Judge of Cir. Ct. of Cook Cnty., Ill.*, No. 06 C 1462, 2007 WL 2875726, at *8 (N.D. Ill. Sept. 28, 2007). The Supreme Court has clarified that the adverse action

[3] Plaintiff asserts that *Ortiz* is the proper analysis, but responds to Defendant's argument relating to *McDonnell Douglas* for completeness.

does not need to be "significant, or serious, or substantial or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 355 (2024). "'Discriminate against' means treat worse...but neither that phrase nor any other says anything about how much worse." *Id*. Plaintiff "need show only some injury respecting [his] employment terms or conditions." *Id*. At 359.

It is undisputed that Plaintiff suffered an adverse action when he was terminated. (Def's Mot., at pp. 5-6). However, even before Plaintiff was terminated, the Defendant began changing his schedule without telling him, which caused him to miss a shift and subjected him to discipline. Around November 19, 2022, Plaintiff's work schedule was changed without prior notice to him, which departed from Defendant's practice of providing employees with approximately three weeks' advance notice of their schedules and not altering a posted schedule without first conferring with the employee. (PF ¶15). As a result of the uncommunicated schedule change, Plaintiff did not report to work on a Saturday he ordinarily had off and subsequently received a written discipline for the absence. *Id*. Defendant's act of changing Plaintiff's schedule without telling him, causing him to miss a shift, and then subjecting him to discipline affects his terms and conditions of employment. He suffered financial harm as well as harm to his employment standing due to the discipline. Therefore, the schedule change resulting in a missed shift and discipline is an adverse act.

### C. A Jury Could Find That Plaintiff Was Meeting Legitimate Job Expectations

Defendant argues that Plaintiff automatically fails the legitimate-expectations prong because he admitted the underlying conduct. That argument misstates the facts, as well as Seventh Circuit law. Where an employer's expectations are applied in a discriminatory manner, the legitimate-expectations inquiry merges with pretext and must be resolved by a jury. *See Curry v.*

*Menard, Inc.,* 270 F.3d 473, 478 (7th Cir. 2001). Pretext "can be proven, among other ways, by evidence showing that the employer's explanation: (1) had no basis in fact; (2) was not the real reason; or (3) was insufficient to warrant the adverse employment action." *Altwasser v. Am.'s Auto Body, Inc.*, No. 21-CV-2524, 2024 WL 1798778, at *10–11 (N.D. Ill. Apr. 25, 2024) (citing *Sanchez v. Henderson*, 188 F.3d 740, 746 (7th Cir. 1999); *James v. Sheahan*, 137 F.3d 1003, 1007 (7th Cir. 1998)).

As discussed above in Section I(A)(i), and incorporated herein, Plaintiff disputes Defendant's characterization of his conduct as "misrepresentation of time worked." Moreover, Whole Foods selectively enforced its timekeeping policy, exaggerated minor conduct into a "major infraction," and used it as a pretext to terminate an African American employee who had engaged in protected activity and recently exercised his FMLA rights. Plaintiff was not aware that taking his break at the beginning of his shift was an issue. (PF ¶36) Store leadership themselves gave conflicting testimony on this point – one former Store Team Leader was "uncertain if the GIG even says anything about taking a break at the beginning of a shift." (PF ¶30). Additionally, this is not listed as a major infraction. (RDF ¶¶33, 58). Violating the break policy and taking a break at the beginning or end of a shift would be handled with progressive discipline, and misrepresentation of time "may lead to discharge," but it's not grounds for immediate termination. (PF ¶¶27, 35). Defendant did not follow any of these procedures in terminating Mr. Peoples. (PF ¶36). Thus, Mr. Peoples presented sufficient evidence to raise a disputed issue of fact as to whether Whole Foods' reasons for his discipline and termination were pretextual. Peoples presented evidence that the rules were enforced selectively. *See Ismail v. Brennan*, 654 F. App'x 240, 245 (7th Cir. 2016) ("Selective enforcement of a rule calls into question the veracity of the employer's explanation."); *see also Gordon*, 246 F.3d at 889; *Stalter*, 195 F.3d at 290.

Additionally, Peoples was a highly rated, long-term employee until he began to be treated differently by Malicoat and complained about the working conditions and treatment. (PF ¶1-5). Under Plaintiff's leadership, the Receiving Department at the Gold Coast store was successful and consistently passed regional audits. (PF ¶1). Plaintiff was well-liked and a hard worker who knew his job and did it well. (PF ¶2). Plaintiff was selected (by regional leadership) and volunteered to support other stores that lacked a receiving department or were getting ready to open a new location, to help them succeed, and this was a testament to Plaintiff's performance and experience. (PF ¶3). Due to his performance, in 2019, Plaintiff was one of four employees nominated at the Gold Coast store for the Team Member of the Year Award. (PF ¶4). In Plaintiff's last job dialogue or review, submitted June 1, 2022, that covered his performance from June 2021 to June 2022, his overall score placed him in the "exceeds standards category," which is the highest level an employee can reach. In this evaluation, he received multiple "exceeds standards ratings" and there were "no needs improvement" or "almost never meets standards" ratings. (PF ¶5). Thus, he was meeting his employer's legitimate expectations until things turned for him beginning in September 2022 under Kristina Malicoat. *See Vichio v. US Foods, Inc.,* 88 F.4th 687, 691 (7th Cir. 2023). Furthermore, as discussed in the next section, Plaintiff presented evidence that he was treated less favorably than those of different races. *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 985 (7th Cir.2001). "Pretext does not require that plausible facts presented by the defendant not be true, only that they not be the reason for the employment decision." *Hasham v. California State Bd. of Equalization*, 200 F.3d 1035, 1045 (7th Cir. 2000). Thus, a jury could reasonably conclude that Plaintiff did not violate policy in the manner Defendant now claims or that any violation was trivial and routinely excused for others.

### D. Plaintiff Has Identified Valid Comparators

Comparators are not necessary in a case such as this, where Plaintiff argues that a rarely enforced rule was enforced against him, leading to his termination. "Mobilizing a rarely enforced rule against an employee is evidence of pretext, even without comparators. Naturally, if a rule is rarely enforced, few employees, if any, would be similarly situated." *Huff*, 42 F.4th at 649 (internal citations omitted).

However, even if comparators are necessary, contrary to Defendant's assertion, Plaintiff has identified similarly situated employees outside his protected class who engaged in comparable or more serious misconduct without termination. At summary judgment, Plaintiff is not required to prove that comparators are identical in every respect, only that they are similar in material ways. *Lewis v. City of Union City*, 918 F.3d 1213, 1227–28 (11th Cir. 2019); *see also Coleman v. Donahoe*, 667 F.3d 835, 846–47 (7th Cir. 2012). Whether a comparator is similarly situated is often a question for the jury. *Lesiv v. Illinois Cent. R.R. C*o., 39 F.4th 903, 918-19 (7th Cir. 2022). "[T]he similarly-situated inquiry is flexible, common-sense, and factual. It asks essentially, are there enough common features between the individuals to allow a meaningful comparison?" *Coleman*, 667 F.3d at 841. The congruence need not be perfect. *Lesiv*, 39 F.4th at 918-19. "All things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination." *Coleman*, 667 F.3d at 846. In the employment discrimination context, the requirement to find a similarly situated comparator is really just the same requirement that any case demands—the requirement to submit relevant evidence." *Johnson*, 892 F.3d at 895.

In a case challenging disciplinary action, the plaintiff and comparator ordinarily must have "dealt with the same supervisor, been subject to the same standards, and have engaged in similar

conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Lesiv*, 39 F.4th at 918-19. "But the similarly situated co-worker inquiry is a search for a substantially similar employee, not for a clone." *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 916 (7th Cir. 2010).

Where the plaintiff argues that an employer's discipline is meted out in an uneven manner, the similarly-situated inquiry dovetails with the pretext question. *Coleman,* 667 F.3d at 858; *see also O'Regan,* 246 F.3d at 985 ("to show pretext (as well as the fourth element of a prima facie case) the inquiry remains the same: the plaintiff must show that similarly situated employees were treated more favorably than the plaintiff"); *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 838 (7th Cir.2009) ("the prima facie case and pretext analyses often overlap.").

In *Coleman*, the Seventh Circuit reversed the court's grant of summary judgment, stating, "Here, Coleman's two white, male co-workers were disciplined by the same decisionmaker, subject to the same code of conduct, and disciplined more leniently for violating the same rule as she. Their case is close enough to Coleman's to provide a "meaningful comparison" and to permit a reasonable jury to infer discrimination." *Coleman*, 667 F.3d at 841. Defendant's insistence that no comparator engaged in the exact same conduct improperly elevates the standard and ignores evidence that timekeeping irregularities, extended breaks, and policy deviations were commonplace and non-terminable for others.

In this case, Plaintiff has presented evidence that other employees outside his protected class were not terminated for the same conduct and for far more serious misconduct. For example, multiple male employees were credibly accused of sexual harassment and even repeated violations of company policy, yet were not fired. One Team Leader, Misael Martinez, had two sexual harassment allegations and was allowed to transfer stores with no termination (PF ¶39); another

employee, Carlos Celis, was accused by multiple women and kept his job. (PF ¶40). By contrast, Mr. Peoples was terminated immediately for a first-time time-clock infraction. Defendant argues that Plaintiff has not presented evidence that Martinez and Celis engaged in sexual harassment, but this is contrary to the record. *Multiple witnesses* corroborated this, including Defendant's own witnesses HR Molly McGuigan and STL Kristina Malicoat.

In addition to the employees who engaged in worse conduct, there's also the non-Black employees who engaged in similar conduct and were not let go. Specifically, Mr. Peoples and former Receiver Arnold Cavazos both testified that there were several non-Black employees, including Cavazos, Martinez, Celis, and Gloria Morales, who would take breaks at the beginning of their shifts to go get coffee and donuts and were not reprimanded or terminated. (RDF ¶¶53-55, 57). Defendant attempts to dismiss this by arguing that these employees did not engage in similar conduct because they did not engage in the same misconduct (take a break and clock out at the beginning of their shift to move their car), but this is irrelevant. Per the Defendant's policies, both violated the same policy of taking a break at the beginning of their shift, which was prohibited.

A jury could find that Mr. Peoples was treated more harshly than comparable employees who did not complain about discrimination, safety concerns, or take FMLA leave, indicating that the rationale for his firing was a sham. Even without one perfect comparator, the uneven enforcement of rules can show pretext. Therefore, Defendant's motion for summary judgment should be denied.

### E. Substantial Evidence of Pretext Exists

Pretext "can be proven, among other ways, by evidence showing that the employer's explanation: (1) had no basis in fact; (2) was not the real reason; or (3) was insufficient to warrant the adverse employment action." *Altwasser*, 2024 WL 1798778, at *10–11 (citing *Sanchez*, 188

F.3d at 746; *James*, 137 F.3d at 1007). Courts are not required to abandon reason and common sense in assessing an employer's actions and they are not required to believe their explanations. *Gordon*, 246 F.3d at 889. *Perdomo v. Browner,* 67 F.3d 140, 145 (7th Cir. 1995) ("Because a fact-finder may infer intentional discrimination from an employer's untruthfulness, evidence that calls truthfulness into question precludes a summary judgment."). Plaintiff does not need to prove that the real reason for an employer's action was discriminatory in order to survive a motion for summary judgment. *Rudin,* 420 F.3d at 726. Plaintiff only needs to establish that a rational fact-finder could infer that the company's reasons were not the real reasons. *Id.* Pretext may be shown by evidence that the employer's explanation is dishonest, inconsistent, or selectively applied. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000).

Plaintiff admitted to conduct, which is not a major infraction (RDF ¶¶33, 58), and to which many others have admitted to as well without discipline (RDF ¶¶53-55, 57). Whole Foods selectively enforced its timekeeping policy, exaggerated minor conduct into a "major infraction," and used it as a pretext to terminate an African American employee who had engaged in protected activity and recently exercised his FMLA rights. However, the policy in question was inconsistently applied, and the evidence shows that the policy was more rigidly applied to Black employees than to Caucasian employees.

Defendant's discipline policy applies equally across the board. (RDF ¶¶49, 53-55, 57). Violating a break policy and taking a break at the beginning or end of a shift is not a major infraction and is normally handled with progressive discipline. (PF ¶35). Progressive discipline starts with a verbal warning or coaching and then progresses through various levels of escalating corrective action up to the end of employment. (PF ¶35). Defendant did not follow any of these procedures in terminating Mr. Peoples. The first and only time this nebulous rule was enforced

against Plaintiff was termination without warning, which coincided with his protected FMLA leave and complaints. Additionally, the discipline and investigation was initiated by Malicoat, whom Plaintiff had recently complained about treating him differently because of his race. (PF ¶¶14, 17-18). There was no reason for Gaughan to start reviewing video of Plaintiff, since Gaughan admitted that there was nothing suspicious about Plaintiff leaving at the end of his shift. (PF ¶20).

Because Plaintiff has presented evidence questioning the veracity of the reason for his termination, there is an issue of fact as to whether Defendant's reasons were the true reasons. Here, a jury could find pretext based on the escalation of minor conduct into a terminable "major infraction"; the absence of progressive discipline despite Plaintiff's long tenure; inconsistent enforcement of timekeeping rules; the suspicious timing following Plaintiff's complaints and FMLA leave; and the failure to meaningfully investigate or consider lesser discipline. Therefore, summary judgment is inappropriate on Plaintiff's claims.

## II. PLAINTIFF HAS PRESENTED SUFFICIENT EVIDENCE OF RETALIATION

Plaintiff engaged in protected activity by complaining about discriminatory treatment, safety concerns, and by exercising his FMLA rights. Starting around September 23, 2022, Plaintiff raised safety concerns to Store Team Leader Malicoat and ASTL Gaughan. (PF ¶6). Plaintiff made complaints about where the chemicals were stored, how the pallets were staged, how the pallets were supposed to get through the hallway and to the sales floor, and about air quality or diesel exhaust. *Id*. Peoples also complained to Store Team Leader Malicoat about food being stored near chemicals. (PF ¶7). After Plaintiff raised safety concerns, he was labeled as resistant to feedback and change as a result of his complaints. (PF ¶11).

Additionally, Plaintiff complained about race discrimination. In November 2022, Plaintiff complained to Associate Store Team Leader Frank Gaughan about the differential treatment that

he experienced from Store Team Leader Malicoat, and Gaughan advised him to try to work it out with her, so Plaintiff approached Malicoat, and during this interaction, he told her that he felt she was mistreating him because he's a Black man in a lead role. (PF ¶14).

Immediately thereafter, Plaintiff began to experience retaliation. Around November 19, 2022, Plaintiff's work schedule was changed without prior notice to him, which departed from Defendant's practice of providing employees with approximately three weeks' advance notice of their schedules and not altering a posted schedule without first conferring with the employee. (PF ¶15). As a result of the uncommunicated schedule change, Plaintiff did not report to work on a Saturday he ordinarily had off and subsequently received a written discipline for the absence. *Id.*

Then, from December 12–16, 2022, Plaintiff took FMLA leave. (PF ¶16). This was the first time Plaintiff took continuous leave, lasting more than two days, while Malicoat was Store Team Leader, and the leave happened to occur during a blackout period, which prohibited employees from taking time off for vacations and PTO. (PF ¶16). While on FMLA leave, Malicoat began raising issues about Plaintiff's performance and having meetings about this with other managers, including Gaughan. (PF ¶17). Shortly thereafter, Plaintiff was subject to an investigation based on false pretenses on December 28, 2022, and then terminated on December 30, 2022. (PF ¶18-19). Temporal proximity, combined with evidence of hostility and disparate enforcement, supports a causal connection sufficient to reach a jury. *See Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315–16 (7th Cir. 2011).

"To succeed on a retaliation claim, the plaintiff does not need to prove that retaliation was the only reason for his termination; he may establish a retaliation claim by showing that the protected conduct was a substantial or motivating factor in the employer's decision," *Goelzer v. Sheboygan Cnty., Wis.*, 604 F.3d 987, 995 (7th Cir. 2010). "A plaintiff can avert summary

judgment on an FMLA retaliation claim either by proffering direct or circumstantial evidence of his employer's discriminatory motivation, or by establishing that, after taking FMLA leave, he 'was treated less favorably than other similarly situated employees who did not take FMLA leave, even though he was performing his job in a satisfactory manner.'" *Lewis v. School Dist. #70*, 523 F.3d 730, 741 (7th Cir. 2008).

Defendant's argument that the decision-maker lacked knowledge of Plaintiff's protected activity is disputed. As discussed above, the record supports an inference that Malicoat influenced the process and that Plaintiff complained directly to Gaughan, who worked with Malicoat to create evidence against Plaintiff and recommend his termination. This information was forwarded upward through management channels for approval, but was left virtually unchallenged and unreviewed. (RDF ¶¶35-37). There's nothing in the record indicating that James Michell (the alleged sole decision-maker conducted his own investigation—on the contrary, he relied on tainted evidence covered in animus against Plaintiff due to his race and protected activity. At summary judgment, Defendant cannot insulate itself by artificially narrowing who it labels the "decision-maker."

## III. PLAINTIFF'S RETALIATORY DISCHARGE CLAIM SURVIVES

For the same reasons, Plaintiff's common law retaliatory discharge claim survives. "A valid claim for retaliatory discharge requires a showing that an employee has been (1) discharged; (2) in retaliation for the employee's activities; and (3) that the discharge violates a clearly mandated public policy." *Geary v. Telular Corp.*, 341 Ill. App. 3d 694, 700-01 (2003). A retaliatory discharge action focuses on the employer's conduct in terminating the employee. *Fragassi v. Neiburger*, 269 Ill. App. 3d 633, 638 (1995). Illinois public policy strongly favors the exposure of violations of laws, rules, and regulations by Illinois citizens so that they may be investigated and reprimanded.

*Palmateer v. Int'l Harvester Co*., 85 Ill. 2d 124, 132-34 (1981). Illinois public policy favors the safety of employees in the workplace. *Cty of Kankakee v. Illinois Fraternal Ord. of Police Lab. Council*, 2014 IL App (3d) 130662-U, ¶ 22.

As discussed above, Plaintiff complained of safety concerns and discrimination. (PF ¶6). These safety complaints meet the requirement of violating a clearly mandated public policy because Illinois public policy strongly favors the exposure of violations of laws, rules, and regulations by Illinois citizens so that they may be investigated and reprimanded, and favors the safety of employees in the workplace, which were the focus of Plaintiff's complaints. Additionally, Plaintiff exercised his protected rights to take FMLA leave. Immediately after Plaintiff's complaints and exercise of his rights, he began to experience retaliation, including having his work schedule changed, being subject to an investigation, being disciplined, and then being terminated – all less than a few months after his complaints. (PF ¶14).

Thus, a reasonable jury could find that Plaintiff was terminated for exercising rights protected by clearly mandated public policy, including the right to take FMLA leave and to oppose workplace discrimination.

## CONCLUSION

In sum, Plaintiff's evidence of suspicious timing, shifting explanations, and the selective, heavy-handed application of a vague policy could lead a jury to conclude that discrimination and/or retaliation were afoot. Thus, Defendant's motion for summary judgment should be denied in its entirety. Genuine disputes of material fact exist as to discrimination, retaliation, comparator treatment, pretext, and the credibility of Defendant's stated justification. These issues must be resolved by a jury, not on summary judgment.

Dated: January 30, 2026

Respectfully Submitted,

By: /s/ *Heidi Karr Sleper*

One of Plaintiff's Attorneys

Heidi Sleper
Thalia Pacheco
Workplace Law Partners PC
155 N. Michigan Ave., Ste. 719
Chicago, IL 60601
(312) 861-1800
hsleper@fishlawfirm.com
tpacheco@fishlawfirm.com

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that a true and correct copy of the foregoing **Plaintiff's Response to Defendant's Motion for Summary Judgment** was served via CM/ECF to all counsel of record on January 30, 2026.

By: /s/ *Heidi Karr Sleper*
One of Plaintiff's Attorneys