**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

**JEVON PEOPLES,**

Plaintiff,

v.

**WHOLE FOODS MARKET, INC.,**

Defendant.

Case No. 1:23-cv-04359
Judge: Thomas M. Durkin

**DEFENDANT'S REPLY IN SUPPORT OF ITS**
**MOTION FOR SUMMARY JUDGMENT**

Dated: February 27, 2026

Respectfully submitted,

*/s/ Maria A. Palivos*
One of Its Attorneys

David K. Haase, Bar No. 6201278
dhaase@littler.com
Maria A. Palivos, Bar No. 6342554
mpalivos@littler.com
LITTLER MENDELSON, P.C.
321 North Clark Street, Suite 1100
Chicago, IL 60654
Telephone: 312.372.5520
Facsimile: 312.372.7880

# TABLE OF CONTENTS


I. DEFENDANTS STATEMENT OF FACTS IS UNREBUTTED .................................... 2

A. Plaintiff Fails to Genuinely Dispute Defendant's Description of the Events Leading to Plaintiff's Termination .......................................... 2

B. Plaintiff Fails to Genuinely Dispute Michell's Decision-Maker Role and the Information Michell Received. ........................................ 4

II. ARGUMENT .......................................................................... 5

A. Plaintiff Cannot Show That He Suffered Race Discrimination. ............................ 5

1. Plaintiff Presents No Evidence of Racial Animus by the Decision-Maker. ........................................................................ 5

i. Plaintiff presents no evidence of discriminatory animus by Michell or McGuigan. ................................................................ 5

ii. Plaintiff Presents No Evidence That Malicoat or Gaughand Were Influential in the Termination Decision .............................. 8

2. Plaintiff Cannot Make a *Prima Facie* Case of Race Discrimination. ........ 9

i. Plaintiff's Termination is the Only Actionable Adverse Action. ................................................................ 9

ii. Plaintiff Was Not Meeting Whole Foods' Legitimate Job Expectations. ................................................................ 11

iii. Plaintiff Fails to Present Evidence of Differential Treatment of Similarly Situated Employees. ............................... 14

a. Even if the Alleged Comparables Plaintiff Identifies Engaged in the Conduct Plaintiff Alleges, They Are Not Similarly Situated .................................................... 14

b. Plaintiff Fails to Present Admissible Evidence That Any of His Alleged Comparables Engaged in the Conduct as Alleged. ...................................................... 16

2. Plaintiff Fails to Present Evidence of Pretext. ......................................... 19

B. Plaintiff Cannot Present Evidence that Whole Foods Retaliated Against Him. ................................................................ 21

1. There is No Evidence of Retaliatory Motivation by the Decision-Makers ..... 21

2. There is No Evidence of Retaliatory Motivation by Malicoat or Gaughan, Because Timing Alone is Insufficient to Sustain a Retaliation Claim. ..... 21

3. Plaintiff Fails to Even Present a Coherent Timeline of Adverse Actions Shortly After Protected Conduct. ..... 22

a. Safety Complaints ..... 22

b. Race Complaint ..... 23

c. FMLA Leave ..... 24

III. CONCLUSION ..... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adusumilli v. City of Chicago*,
164 F.3d 353 (7th Cir.1998) ....................3

*Beckel v. Wal–Mart Assocs., Inc.*,
301 F.3d 621 (7th Cir.2002) ....................3

*Chaney v. Plainfield Healthcare Center*,
612 F.3d 908 (2010)....................16

*Diliberti v. United States*,
817 F.2d 1259 (7th Cir.1987) ....................3

*Galvan v. Indiana*,
117 F.4th 935 (7th Cir. 2024) ....................21

*Gordon v. United Airlines, Inc.*,
246 F.3d 878 (7th Cir. 2001)....................20

*Howard v. Inland SBA Mgmt. Corp.*,
32 F. Supp. 3d 941 (N.D. Ill. 2014) ....................17

*Huff v. Buttigieg*,
42 F.4th 638 (7th Cir. 2022)....................8, 9, 14

*Lesiv v. Illinois Cent. R.R. Co.*,
39 F.3d 903 (7th Cir. 2022)....................14, 15

*Lewis v. City of Union City*,
918 F.3d 1213 (11th Cir. 2019)....................15

*Lloyd v. Swifty Transportation, Inc.*,
552 F.3d 594 (7th Cir.2009) ....................9

*Oest v. Illinois Department of Corrections*,
240 F.3d 605 (7th Cir.2001) ....................9

*Peele v. Country Mut. Ins. Co.*,
288 F.3d 319 (7th Cir. 2002) ....................13

*Phillips v. Baxter*,
2024 U.S. App. LEXIS 10078 (7th Cir. 2024) ....................9

*Stalter v. Wal-Mart Stores, Inc.*,
195 F.3d 285 (7th Cir. 1999) .......... 20, 21

*Sweeney v. West*,
149 F.3d 550 (7th Cir.1998) .......... 9

**Statutes**

513 F.3d at 690 .......... 15

667 F.3d at 841 .......... 14, 15, 16

FMLA .......... 21, 24, 25

This Reply Memorandum is submitted in response to Plaintiff's Response to Defendant's Motion for Summary Judgment ("Response" or "Resp.").

Contrary to Plaintiff's assertion, Plaintiff was not terminated for taking his break at the beginning of his shift. The termination document and the decision-maker's testimony both clearly indicate that Plaintiff was terminated for misrepresentation of time worked. Plaintiff fails to cite any evidence that the decision-maker's sworn statement, that he viewed Plaintiff's conduct as misrepresentation of time worked, is a lie. Plaintiff cites no evidence that the decision-maker had any unlawful motivation. Plaintiff also cites no evidence that the person who provided the information the decision-maker relied on had any unlawful motivation.

On the subject of comparables, Plaintiff ignores the evidence that other individuals were identified who did the exact same thing that Plaintiff did and received the same penalty. Plaintiff identifies no comparable who engaged in similar conduct to Plaintiff without being terminated. The alleged comparables Plaintiff identifies are not supported by the evidence, and even if they were, their conduct was much different, and in any event was unknown to the decision-maker.

Plaintiff's remaining arguments are background noise when Plaintiff's many misstatements of the evidence are corrected. This Reply will focus on addressing many of these in the context of the arguments that these purportedly support, within the organizational framework of Defendant's Memorandum of Law in Support of its Motion for Summary Judgment ("Initial Brief"). More detailed corrections are included in Defendant's Response to Plaintiff's Statement of Additional Facts ("Def.'s Resp. to Pl.'s SOF") and Defendant's Reply to Plaintiff's Response to Defendant's Statement of Material Facts ("Def.'s Reply to its SOF").

This Reply also will address case authority Plaintiff cites, within the organizational framework of the Initial Brief. Because Plaintiff's Response never once addresses any of the case

authority cited in the Initial Brief, to avoid repetition, Whole Foods will minimize references to those in this reply.

In addition, this Reply will address Plaintiff's Response's failure to cite Seventh Circuit case law that outright rejects their position on a newly raised issue, despite the obligation to cite binding authority.

## I. DEFENDANTS STATEMENT OF FACTS IS UNREBUTTED

### A. Plaintiff Fails to Genuinely Dispute Defendant's Description of the Events Leading to Plaintiff's Termination.

Defendant's Initial Brief explains that Whole Foods learned, via video footage, that Plaintiff, when he arrived at work, would pull up, leave his car to clock-in, return to his vehicle, go park the vehicle, and then leave his vehicle to begin working. The video footage showed that Plaintiff had done this many times. Whole Foods interviewed Plaintiff to get his side of the story. Plaintiff admitted to the conduct and stated only that he was doing this because he was running late, for personal reasons. (Initial Brief at 1-2.)

Plaintiff's Response attempts to recharacterize the conduct. In the process, Plaintiff mischaracterizes the evidence and further, ignores that fact that he did not make any of his current assertions when questioned by Whole Foods.

Plaintiff's Response incorrectly states, "Before moving his car, Plaintiff routinely began working upon arrival . . ." (Response at 4, *see also* Response at 10-11.) Yet, Plaintiff's actual testimony only alleges that he often did work after parking his car but before walking into the building where he worked. For example, Plaintiff testified:

Q. Okay. So you would -- you would pull up, run upstairs, punch in, run back to your car, then park at the 30 West Huron parking lot?
A. Uh-huh.
Q. And then from there, you'd get out of your car and go back to where you punched in to start work?
A. Go back to the store location.

Def. Ex. A, Plf.'s Dep. 93:12-19. *See also* Plaintiff's Response to Defendant's Statement of Material Facts ("Pl.'s Resp. to Def.'s SOF"), ¶21, citing Plf.'s Dep. at 93, where Plaintiff alleges that after he moved his car, he returned through the receiving dock and often did work before walking into the building. Def. Ex. A, Plf. Dep, 93:12-19; 98:10-20; 98:21 – 99:11.

Plaintiff oddly includes a depiction of his conduct in his Declaration at paragraph 3, which he does not cite anywhere in his Response, his statement of additional facts, or his response to Defendant's statement of facts. As such, that paragraph should be ignored. Further, that Declaration would not change anything, for it begins with a statement that, "For the most part," and thus, the Declaration does not purport to characterize all (or almost all) of the incidents where he engaged in the conduct at issue. Similarly dodgy, the Declaration states that he would begin working "before or after" (emphasis added) moving his car, and thus it does not allege that he began working before he moved his car. Further, if these qualifiers were eliminated, it would contradict his deposition testimony and thus should be disregarded. *Adusumilli v. City of Chicago*, 164 F.3d 353, 360 (7th Cir.1998), quoting *Diliberti v. United States*, 817 F.2d 1259, 1263 (7th Cir.1987) ("[w]here deposition and affidavit are in conflict, the affidavit is to be disregarded"); *Beckel v. Wal–Mart Assocs., Inc.*, 301 F.3d 621, 623 (7th Cir.2002) (this is because affidavits, "when offered to contradict the affiant's deposition are so lacking in credibility as to be entitled to zero weight in summary judgment proceedings").

Moreover, it is crucial that it is entirely undenied that Plaintiff, when asked by Whole Foods why he engaged in this conduct, did not claim that he started working before (or even after) parking his car. Similarly, Plaintiff never attests to saying to anyone in Whole Foods management that he was running late due to his daughter's medical condition. Rather, when asked by Whole Foods, Plaintiff said only that he was running late for personal reasons. (SOF ¶28, citations omitted:

"McGuigan had a meeting with Plaintiff to ask his side of the story . . . Plaintiff admitted to McGuigan and Payne that he had been driving up, clocking in, going back to his car, parking it at the employee parking garage, and then going to work, and that he had been doing so for several months. During that meeting, McGuigan and Payne asked Plaintiff why he did this, and Plaintiff said that it was because he was running late. McGuigan and Payne asked Plaintiff why he was running late, and he said 'personal reasons.' ") Plaintiff does not dispute SOF ¶28.

### B. Plaintiff Fails to Genuinely Dispute Michell's Decision-Maker Role and the Information Michell Received.

Completely absent from Plaintiff's lengthy Response is any denial that Michell is the decision-maker regarding Plaintiff's termination. Similarly, Plaintiff never denies the accuracy of the summary of the information Michell received when he made the decision, as summarized in the Initial Brief at 1-2. Plaintiff also never alleges that Malicoat provided any of the information Michell considered when he made his decision.

Plaintiff's Response never alleges that there is evidence that Michell had any discriminatory or retaliatory animus towards Plaintiff or that Michell had any knowledge of the allegedly similarly situated employees Plaintiff lists.

Plaintiff asserts that "Malicoat's actions directly led to Plaintiff's suspension and firing." (Resp. at 9.) Yet, more precisely, all Plaintiff really is saying is that: Malicoat wanted to speak with Plaintiff; when Plaintiff was not present for that desired conversation, that absence led Gaughan to review the video footage; and that review led to the discovery of Plaintiff's conduct and his subsequent termination. (Resp. at 9.) None of that suggests that Malicoat played a role in the *decision* to terminate, or even that she provided any information to the decision-maker to influence the decision.

Plaintiff repeatedly refers to the prohibition against taking breaks at the start of one's shift (Resp. at 5, 10, 15, 20), but the contemporaneous termination document and Michell's testimony both clearly state that the termination was due to the major infraction of misrepresentation of time worked. (SOF ¶37; Def. Ex. D, Michell Decl. ¶5; Def. Ex. A, Plf. Dep. Exh. 15, WFM_0000340.) Plaintiff's facts section (Resp. at 1-5) contains numerous additional misstatements which are discussed below.

## II. ARGUMENT

The facts stated in the preceding section, alone, are sufficient to sustain a summary judgment award. Facing this evidence, Plaintiff makes the following arguments, all of which fail, as is discussed below.

### A. Plaintiff Cannot Show That He Suffered Race Discrimination.

#### 1. Plaintiff Presents No Evidence of Racial Animus by the Decision-Maker.

Plaintiff makes no effort to suggest that there is evidence of racial animus by the decision-maker, Michell, or McGuigan, who provided the information to Michell when he made his decision.

Plaintiff attempts to avoid this fatal flaw in their case by alleging that Malicoat and Gaughan had racist motivation. This argument fails for two (2) independent reasons. First, Plaintiff presents no competent evidence of racial motivation by Malicoat or Gaughan. Second, Malicoat and Gaughan were not involved in the termination decision.

##### i. Plaintiff Presents No Evidence of Discriminatory Animus by Michell or McGuigan.

Plaintiff primarily attempts to paint Malicoat as the villain, but in so doing, makes a flurry of mischaracterizations of the evidence. (Resp. at 7-9.) First, Plaintiff alleges that Malicoat did not deny her alleged racial motivation ("[Plaintiff accused Malicoat of] . . . mistreating him because

he's a Black man in a lead role, which she did not deny.") (Resp. at 8.) This is false. In fact, Plaintiff testified (twice) that Malicoat said, "I don't like you because you're a negative person." (Def.'s Resp. to Pl.'s SOF ¶14; Def. Ex. A, Plf.'s Dep. 78:3-5, 76:14-17.) That is a denial that she disliked him due to his race.

Plaintiff asserts that on December 28, 2028, Malicoat ". . . initiat[ed] disciplinary action and investigation into Plaintiff . . .  (Resp. at 7, 8-9.) Yet, none of the cited facts suggest that Malicoat initiated or even contemplated disciplinary action. On the contrary, the emails Plaintiff cites merely indicated a plan to meet with Plaintiff to discuss listed issues and manage performance. Malicoat specifically said in one of these emails that she "want[s] to work with him on those changes." (Def. Ex. A, Plf. Dep. Ex. 15, WFM 0000304-310.) Her desire to discuss job-related issues with Plaintiff is unremarkable. It is particularly unremarkable where, as here, there is no evidence that she intended to discipline Plaintiff.[1]

The only other alleged facts Plaintiff cites of Malicoat's alleged discriminatory motive are that she allegedly: (a) did not thank the three-person receiving department in a speech where she thanked all other departments; (b) did not invite Plaintiff to team member meetings that he had been invited to in the past (but he does not deny that the meetings were at 2:00 p.m. and his workday ended at 1:30 p.m.) (SOF ¶71); (c) store leadership was predominantly non-black (but with no evidence of discrimination in any of the leadership hirings and further, the cited evidence lists eleven leaders – four White/non-Hispanic, five Hispanic, two Black) (Def.'s Resp. to Pl.'s SOF ¶13); and (d) Plaintiff claims that in a survey, he complained about the number of black

[1] It becomes even more unremarkable if one reads Malicoat's four emails, where she checks on whether the issues she wished to discuss were appropriate for discussion, e.g., whether anyone had approved Plaintiff working through lunch and leaving early, along with the absence of any evidence that she was previously aware of the incense-lighting. (Pl.'s SOF ¶18, Plf.'s Dep. Exh. 15.)

employees in leadership positions, but never challenges the evidence that his comments were anonymous. (Pl.'s Resp. to Def.'s SOF ¶69.)

No reasonable finder of fact could conclude, from the above, that there is competent evidence of racial animus by Malicoat (or anyone else).

Plaintiff then takes aim at Gaughan. First, Plaintiff implies that Gaughan should not have told Plaintiff to have a discussion with Malicoat when he (Plaintiff) told Gaughan that Plaintiff had issues with his working relationship with Malicoat. Yet, Plaintiff admits that he did not tell Gaughan that he believed Malicoat was racially motivated. (Def.'s Resp. to Pl.'s SOF ¶14.) In that context, it is unremarkable that Gaughan suggested that Plaintiff talk to Malicoat.

Plaintiff complains that Gaughan had no reason to review the videos that caught Plaintiff engaging in misconduct. (Resp. at 8.) Gaughan's declaration states that Plaintiff left early on December 28, 2022, when they were looking for him to speak with him, and that Gaughan then checked Plaintiff's punches and saw that Plaintiff had not clocked out for lunch all week. (Def. Ex. B, Gaughan Decl. ¶¶3-4.) Plaintiff agrees that on December 28, 2022, he clocked out at 1:09 p.m., but he alleges that his shift ended that day at 1:00 p.m., so he did not clock out early that day. (Resp. at 9.) Yet, the evidence he cites does not support the assertion that Plaintiff's shift ended that day at 1:00 p.m. (Def.'s Resp. to Pl.'s SOF ¶71.) Further, it is undisputed that Plaintiff's shift normally ended at 1:30 p.m. (Def.'s Resp. to Pl.'s SOF ¶71), so even if Plaintiff had been scheduled to leave at 1:00 p.m. on that particular day, it would be unremarkable for Gaughan to believe Plaintiff had left early. That is particularly true, given that one of the issues discussed in the emails leading up to the attempt to speak with Plaintiff was his pattern of not taking lunch and leaving early. (Plf.'s SOF ¶71, Def. Ex. A, Plf. Dep. Exh. 15.) Plaintiff does not even allege any other fact

purporting to show racial motivation by Gaughan. Gaughan's decision to review the video footage cannot reasonably be construed as driven by racism.

In sum, Plaintiff fails to present any evidence of racial animus by the Malicoat or Gaughan.

### ii. Plaintiff Presents No Evidence That Malicoat or Gaugh Were Influential in the Termination Decision.

Even if there were evidence of racial animus by Malicoat or Gaughan, that would not save Plaintiff's case; their motivation is irrelevant, because neither of them was involved in the termination decision. Plaintiff ignores Defendant's case law to this effect. (Initial Brief at 4-5.)

Plaintiff cites *Huff v. Buttigieg*, 42 F.4th 638 (7th Cir. 2022) for the "cat's paw" theory of liability. But that theory applies where the individual with unlawful motivation plays a significant role in the decision at issue. Thus, in *Huff*, the individual who allegedly had unlawful motivation drafted the memorandum to the decision-maker that the decision-maker relied on in making the decision:

> The memo informed Huff that she was in "noncompliance of [her] Treatment and Rehabilitation Plan" for violating the medication-approval provision. In several pages, the memo described Huff's emails and the FAA's reminders that phone calls were required. The memo also disapproved of her attempt to circumvent the proper channels by seeking medication approval from the Aviation Medical Examiner's office.

*Huff*, 42. F.3d at 643. Further, the Court concluded that under the employer's procedures, the noncompliance memo automatically resulted in the employee's termination. *Id*. at 652.

Here, in contrast, McGuigan, who is not accused of unlawful motivation, prepared the email to the decision-maker (Michell). McGuigan's email includes Plaintiff's admission of guilt to McGuigan and Jason Payne. (SOF ¶¶ 28, 30, 31, 35, 36.) While McGuigan's email to Michell included Gaughan's summary of the particular days Plaintiff engaged in his misconduct, Michell's unrebutted testimony is that the exact number of times Plaintiff engaged in his misconduct was

unimportant to him, but the fact that Plaintiff had done this at least several times made it particularly clear that termination was warranted. (Def. Ex. D, Michell Decl. ¶39.) Plaintiff admits that when asked by Whole Foods, he said that he engaged in the conduct "a few times." (SOF ¶29.) Thus, the information in Gaughan's email was unimportant to the decision-maker.

Nor is there any evidence that the email to Michell would automatically result in termination, in contrast to the memo drafted by the alleged discriminator in *Huff*. As such, *Huff* is inapplicable.

Thus, Plaintiff's claims that Malicoat and/or Gaughan had discriminatory malice are irrelevant, in addition to being unsupported, as they did not make the decision, nor were they influential in it.

**2. Plaintiff Cannot Make a *Prima Facie* Case of Race Discrimination.**

Plaintiff makes three (3) arguments to support his claim that he presents a *prima facie* case. Each of them fails, as is discussed below.

**i. Plaintiff's Termination is the Only Actionable Adverse Action.**

Plaintiff asserts that a written warning he received is actionable. (Resp. at 13-14.) Plaintiff fails to mention the *three* (3) Seventh Circuit cases that specifically hold that a written warning is not actionable. *See Lloyd v. Swifty Transportation, Inc.*, 552 F.3d 594, 602 (7th Cir.2009) ("written reprimands without any changes in the terms and conditions of employment are not adverse employment actions"); *Oest v. Illinois Department of Corrections*, 240 F.3d 605, 613 (7th Cir.2001) (same); *Sweeney v. West*, 149 F.3d 550, 556–57 (7th Cir.1998) (holding that counseling statements which admonished the employee to improve did not constitute adverse employment action); *see also Phillips v. Baxter*, 2024 U.S. App. LEXIS 10078, at *8 (7th Cir. 2024) (plaintiff's reassignment "was not an adverse action because there was no evidence that it left him 'worse off'

with respect to the terms and conditions of his employment”). With respect, this failure to address these cases per their obligation to cite applicable binding authority shows a lack of candor.

Even absent that case authority, Plaintiff's assertion of this alleged schedule change and written warning would fail because Plaintiff does not allege this issue in his Complaint - or in his Answers to Interrogatories that ask that he list the alleged discriminatory actions. (*See* Dkt. 1, Complaint; Def. Ex. F, Plf. Second Amended Answers and Objections to Defendant’s Interrogatories, Interrog. No. 8; SOF ¶62, 63, 71.)

And Plaintiff fails to cite any evidence to support the allegation that his schedule was changed without notice. Rather, per the document, Plaintiff was scheduled for a single Saturday and did not show up, so he received a warning. (Def.’s Resp. to Pl.’s SOF ¶15, Plf.’s Dep. 177:10-178:3.) Plaintiff provides no countervailing testimony other than to vaguely state in his deposition that this warning was “untrue.” On the warning form itself, Plaintiff does not explain why he disagrees with it, under the “Team Member’s statement” portion, which he left blank. (Def.’s Resp. to Pl.’s SOF ¶15, Def. Ex. A, Plf. Dep. Exh. 15, WFM_0000342.)

Jason Payne is the individual who issued the warning (Def.’s Resp. to Pl.’s SOF ¶15, Def. Ex. A, Plf. Dep. Exh. 15, WFM_0000342.) Plaintiff does not list any other alleged evidence that Payne had discriminatory or retaliatory motives. Nor is this warning a standout, as Plaintiff received a warning for a failure to show up for his shift from a different supervisor one year earlier, where Plaintiff similarly refused to sign (Def.’s Resp. to Pl.’s SOF ¶15, Def. Ex. A, Plf.’s Dep. Exh. 15, WFM_0000353), as well as numerous other written warnings in his personnel file. (SOF ¶9, Def. Ex. A, Plf. Dep. Exh. 15.) Plaintiff's assertion that this one warning caused him “financial harm” (Resp. at 14) is another unsupported and fabricated factual statement. Thus, Plaintiff's allegations regarding this written warning should be disregarded. He offers no factual support for

his assertion that this was issued for discriminatory or retaliatory motives and in any event, the case law is clear that the warning is not actionable.

#### ii. Plaintiff Was Not Meeting Whole Foods' Legitimate Job Expectations.

Plaintiff's Response entirely ignores the case authority cited in the Initial Brief at 6-7, that an employee who fails to comply with company policies fails to meet the company's legitimate expectations, a requirement for a *prima facie* case.

Instead, Plaintiff states that he "disputes Defendant's characterization of his conduct as 'misrepresentation of time.' " (Resp. at 15.) But Plaintiff's only argument that his conduct was not a misrepresentation of time worked is his assertion that taking a break at the beginning of his shift was not a major infraction and that the GIG states that misrepresentation of time "may" lead to discharge.

In making these arguments, Plaintiff entirely ignores Michell's affidavit, cited in the Initial Brief at 7:

> 38. In Michell's view, this clearly constituted misrepresentation of time worked, because by clocking in, Plaintiff was representing that he had arrived at work and was ready to work, when in fact, he still needed to leave, go to his car, park it, and then go from the car to work before he could begin working. (Michell Decl. ¶5). To Michell, this was no less serious than one employee clocking another employee in before the second employee arrived, so that it would appear that the second employee had arrived on time when in fact the second employee was late. (Michell Decl. ¶5). In Michell's view, if Plaintiff could not park and then get to his work station on-time, honesty required that he clock-in late. (Michell Decl. ¶6). This would simply result in a tardiness occurrence. (Michell Decl. ¶6).

> The exact number of times Plaintiff did this was unimportant to Michell, though the fact that Plaintiff had done it at least several times made it particularly clear that termination was warranted, despite his long tenure. (Michell Decl. ¶7). Similarly, the number of minutes this saved Plaintiff was unimportant to Michell. (Michell Decl. ¶7). While the email to Michell indicated that Plaintiff generally arrived at the receiving door, where he could begin work, between six and twenty-two minutes after he clocked in, even if the number of minutes were much fewer, the nature of the offense would be the same. (Michell Decl. ¶7).

(SOF ¶¶38-39). Plaintiff presents no evidence that this viewpoint was not sincerely held.

Plaintiff also ignores the evidence that Whole Foods consistently viewed similar conduct as misrepresentation of time worked. Michell's own experience was that misrepresentation of time always resulted in termination. He recalled one specific example of an employee who he terminated for such conduct. While Plaintiff correctly points out that the employee's conduct could be viewed as more egregious because he drove recklessly, that does not change the fact that Michell viewed the action of driving up, clocking in, going back to his car, and then parking it as a misrepresentation of time worked. (SOF ¶¶38-39.) Similarly, while Plaintiff correctly points out that Michell did not recall the race of the individual, again, this does not change the fact that the conduct was viewed as a misrepresentation of time worked.

Plaintiff also ignores the evidence that two (2) others at Plaintiff's store were terminated for misrepresentation of time worked. Maria Torres was literally terminated for the exact same offense as Plaintiff, under the "misrepresentation of time worked" rule, and she only engaged in that conduct once. Josh Levy was terminated for violation of the misrepresentation of time rule when he was caught being on break for an extended period of time. (Initial Brief at 8, SOF ¶¶51-

52.) Neither of these individuals is black or is known to have engaged in protected conduct. (Initial Brief at 8, SOF ¶¶51-52.)

Thus, Plaintiff's failure to comply with company policy at the time of his termination means that he fails to present a *prima facie* case. *See* cases cited in Initial Brief at 6-7. For purposes of this analysis, the relevant inquiry is Plaintiff's performance at the time of the termination. *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002) (affirming the district court's grant of summary judgment to defendant employer, because plaintiff did not meet defendant's legitimate employment expectations *at the time of her termination*) (emphases added).

Plaintiff's assertions that he was a superstar employee (Resp. at 16.) are unfounded and irrelevant. Plaintiff was indeed rated at the "Exceeds Expectation" level. However, there is no evidence as to what percentage of employees received this rating level. While Plaintiff did at times fill in at other stores as needed, the evidence does not support Plaintiff's assertion that an employee filling in at another store was unusual or particularly laudatory. (Def.'s Resp. to Plf.'s SOF ¶3.) In addition, the fact that Plaintiff, an employee of Whole Foods for many months was once nominated – but not selected – to be employee of the month, three years before the actions at issue, is immaterial. Indeed, a review of the many written warnings Plaintiff received (SOF ¶9, Def. Ex. A, Plf. Dep. Exh. 15) rebuts the assertion that Plaintiff was a stellar employee.

But more to the point, the level of Plaintiff's job performance is irrelevant, as it does not excuse his failure to comply with the policy against misrepresentation of time and it was not considered by the decision-maker.

**iii. Plaintiff Fails to Present Evidence of Differential Treatment of Similarly Situated Employees.**

**a. Even if the Alleged Comparables Plaintiff Identifies Engaged in the Conduct Plaintiff Alleges, They Are Not Similarly Situated.**

Plaintiff argues that he need not identify valid comparators if the rule at issue is rarely enforced, citing *Huff*, 42 F.3d at 649. Yet, in *Huff*, there is no example given of where the employer terminated another employee for the offense at issue. Here, Defendant has identified three (3) others who were terminated pursuant to the rule at issue, for similar conduct. Plaintiff simply ignores these positive comparators. Nor is there any evidence presented that these are the only examples – they are simply the ones that two deponents recalled when asked. (Initial Brief at 8, SOF ¶¶51-52.) Plaintiff presents no evidence that there were not others terminated for such conduct (and Whole Foods represents in good faith that there are others, some of whom were identified in written discovery responses in this litigation).

Plaintiff then argues that the employees who allegedly took breaks at the start of their shift and employees who allegedly engaged in sexual harassment are valid comparators. Yet, the cases Plaintiff cites fail to support that argument. First, Plaintiff's own citations demonstrate that his alleged comparables are irrelevant if they were unknown to the decision-maker. Plaintiff states, "In a case challenging disciplinary action, the plaintiff and comparator must have 'dealt with the same supervisor . . ." and quotes *Lesiv v. Illinois Cent. R.R. Co.*, 39 F.3d 903, 918-19 (7th Cir. 2022). Similarly, Plaintiff cites *Coleman*, where the Court states, "Here, Coleman's two white, male co-workers were disciplined by the same decisionmaker . . . "). 667 F.3d at 841. In *Coleman*, the Court further explained: "While we have sometimes phrased the question ambiguously as whether the comparators "*dealt with* the same *supervisor*," *e.g., Gates*, 513 F.3d at 690 (emphasis added), the real question is whether they were "treated more favorably by the *same*

*decisionmaker*." *Coleman*, 667 F.3d at 848 (emphasis in original). In this case, none of Plaintiff's alleged comparators were known to the decision-maker, Michell. (SOF ¶¶ 58, 60, 61.) Therefore, all these comparators fail for this reason alone.

Second, the cases Plaintiff cites (Resp. at 17-18) do not provide any support whatsoever to comparing alleged sexual harassment or taking a break at the start of a shift to the different offense of misrepresentation of time worked.[2] *Lesiv* contradicts Plaintiff's argument. The Court concluded that the plaintiff had failed to provide a valid comparable, because while the plaintiff and the alleged comparable both refused a work assignment, the plaintiff's tone toward the supervisor was hostile. *Lesiv,* 39 F.3d at 919. Thus, the two individuals (the plaintiff and another employee) who violated the same rule were not similarly situated due to the exacerbating circumstances of the plaintiff's conduct. These differences are less significant than the ones present here.

*Lewis v. City of Union City,* 918 F.3d 1213 (11th Cir. 2019), cited by Plaintiff, also contradicts Plaintiff's argument. In *Lewis*, the Court concluded that Plaintiff failing a training requirement was not comparable to other employees failing a physical fitness requirement. *Id*. at 1230. Again, these differences are less significant than the ones present here.

*Chaney v. Plainfield Healthcare Center*, 612 F.3d 908 (2010) also contradicts Plaintiff's argument, stating that two employees who engaged in nearly identical conduct were not similarly situated because the decision-makers were not the same. *Id*. at 916. The Court also found another employee to be comparable to the plaintiff because both employees failed to respond to the same

[2] Plaintiff also makes a reference to Wally Colon for allegedly leaving meat out, resulting in spoilage. (Resp. at 11.) Plaintiff cites SOF ¶61, which alleges that meat was left out but makes no reference to Colon being responsible (as opposed to, for example, the receiving department being responsible for refrigerating meat after it was delivered). Nor does Plaintiff assert that this would constitute a "major infraction" (it would not) or explain how this would be comparable to a misrepresentation of time.

call from the same patient, with the only differentiator being that the plaintiff was also accused of swearing – and there was significant evidence that the swearing accusation was unsupported. *Id*. The similarities between those two employees' conduct is far more similar than Plaintiff's alleged comparables, as the two employees at issue in *Chaney* literally were accused of ignoring the same call from the same patient.

*Coleman* does not support Plaintiff's claim because there, the plaintiff was terminated for admitting to having thoughts of killing her supervisor, while the comparators had threatened another employee at knifepoint. The conduct of potentially threatening the life of an employee was present in all three instances. *Coleman*, 667 F.3d at 851.

In sum, Plaintiff fails to identify similarly situated employees, for two reasons. First, the decision-makers are not the same. Second, the nature of the alleged conduct is different.

**b. Plaintiff Fails to Present Admissible Evidence That Any of His Alleged Comparables Engaged in the Conduct as Alleged.**

Here again, Plaintiff mischaracterizes the evidence. Plaintiff alleges that "multiple male employees were credibly accused of sexual harassment without being terminated." (Resp. at 18.) Plaintiff cites Paragraphs 39-40 of his Statement of Additional Facts. Yet, the testimony cited does not support that assertion. Plaintiff's statement that "Multiple witnesses corroborated this . . ." (Resp. at 19) is another misrepresentation of the evidence.

Edwards testified that he never received complaints about Martinez, though he became aware of some allegations regarding stalking because someone (that he does not remember) told him. He testified that he did not have any personal knowledge regarding these allegations and that he did not know whether these allegations were true or false. Pl. Ex. 2, Edwards Dep., 231:5-232:18, 256:16-257:1, 231:5-232:18. This is inadmissible hearsay and should be disregarded**.**

*Howard v. Inland SBA Mgmt. Corp.*, 32 F. Supp. 3d 941, 949 (N.D. Ill. 2014). Malicoat testified that she was not involved in the investigation and does not "know the details of who, what, and why." (Def.'s Resp. to Pl.'s SOF ¶39.) None of this is admissible evidence that Martinez engaged in sexual harassment.

McGuigan testified that Martinez was terminated for sexual harassment, while Martinez claims that he resigned. (Def.'s Resp. to Pl.'s SOF ¶39.) Thus, the only possible evidence that Martinez was guilty of sexual harassment would be to accept that Whole Foods terminated his employment and draw an inference that Martinez must have been guilty of whatever prompted the termination. But if that is what happened, then there is no argument that Martinez was treated more leniently than Plaintiff. There is no admissible evidence that Martinez engaged in sexual harassment without being fired.

There is no admissible evidence that Celis engaged in sexual harassment. Malicoat testified that she was aware that Celis asked a woman out, that Malicoat talked to that woman and asked her what she wanted as the outcome of the situation, and that this employee told Malicoat that she wanted Malicoat to tell Celis not to ask her out again. Malicoat followed the instruction, talked to Celis and told him not to ask the employee out again, and Celis complied. (Def.'s Resp. to Pl.'s SOF ¶40.) At a minimum, an employer could reasonably conclude that an employee asking a co-worker on a date, once, does not constitute sexual harassment.

Edwards testified that "a customer or a vendor that said he followed – they said he followed him to Portillo's and asked them out on a date or something like that." Thus, Edwards said that an unknown person said that Celis followed them to ask them out on a date, once. Edwards testified that he did not have any personal knowledge regarding these allegations and that he does not recall whether there was an investigation. (Def.'s Resp. to Pl.'s SOF ¶40.) This is inadmissible hearsay

and should be disregarded. Even accepted, there is no evidence of credibility of the hearsay assertion and there is not even an assertion of what year this allegedly occurred.

Plaintiff's assertion that others took breaks immediately upon arrival similarly is unsupported by the cited evidence. (Resp. at 18.) For example, Plaintiff testified, as cited by Plaintiff's Statement of Additional Facts, only that he was aware of other employees taking breaks within one hour of punching in. ("There's a variety of -- there was a number of team members that -- I don't know names or specifics, but team members that take -- come in, punch in, go right out, have a smoke break; come in, go right out, go get coffee and donuts for team members well within that first hour of punching in or punching in, yes." (SOF ¶53, Def. Ex. A, Plf. Dep. 174:2-17.) Plaintiff repeatedly admitted that he never saw anyone clock in and *immediately* go on break. (SOF ¶¶56, 57.)[3]

Nor did any of the employees Plaintiff identifies claim to have clocked in and immediately gone on break. While Cavazos initially testified that he took a break "at the beginning of his shift," he subsequently clarified that he took a break a couple hours after his shift started, and that this is what he meant by taking a break "at the beginning of his shift." (SOF ¶28.) Cavazos further clarified that he took a break 30 to 40 minutes into his shift at the old Gold Coast store and two (2) hours into his shift at the new Gold Coast store. (SOF ¶28.) Martinez testified that he never took a break immediately after clocking in for work. (Def. Ex. G, Martinez Dep. 36:7-22.) He took his break at 9:30 a.m. or 10:00 a.m. when his shift started at 5:30 a.m., and during his break he would get coffee or get donuts for his team. (Def. Ex. G, Martinez Dep. 36:7-22.) Gloria Morales and Carlos Celis did not provide testimony.

[3] Even more far-fetched is Plaintiff's statement that ". . . dozens of other employees . . . took breaks in the morning." (Resp. at 12.) Plaintiff cites no evidence for this assertion. Technically, it presumably is true, but there is no evidence that these dozens of employees – or anyone – took a break immediately after clocking in.

There is no testimony that Michell, McGuigan, Malicoat or Gaughan was aware of any of these alleged instances, even if they were somehow deemed to be problematic.

In sum, Plaintiff fails to provide admissible evidence supporting his allegations of the conduct of employees that allegedly make them similarly situated, either in the nature of their conduct or as being known to the decision-maker.

### 2. Plaintiff Fails to Present Evidence of Pretext.

Whole Foods maintains that Plaintiff's conduct was deceptive and was a misrepresentation of his actual time of beginning his work. The Court need not make a determination on whether it agrees with this characterization of Plaintiff's conduct. As cited in the Initial Brief at 9-10, the Court does not sit as a super-personnel department to second guess whether the characterization was accurate or whether the penalty was fair. To evade summary judgment, Plaintiff must present evidence that Michell, the decision-maker, did not genuinely view Plaintiff's misrepresentation of time worked and had a discriminatory motive in the decision to terminate due to misrepresentation of time worked.

Michell's reasoning as to why he viewed Plaintiff's conduct as a misrepresentation of time is set forth above at pages 11-12. At a minimum, his explanation is plausible. Even if there were employees who took breaks immediately after clocking in, and even if Michell knew of such conduct (he did not), it is entirely plausible to view that as not being a misrepresentation of time worked.

The treatment of others does not help Plaintiff's claim, either. The record shows Michell specifically terminating the employment of at least one employee for similar conduct (and characterizing it as misrepresentation of time worked) and it further shows Whole Foods having terminated the employment of at least two (2) other specific, non-black employees for similar

conduct, including Torres, who was terminated for a single instance of the exact same kind of conduct. Conversely, there is no evidence that any Whole Foods employee engaged in similar conduct but was not discharged.

Therefore, Plaintiff's invocation of *Gordon v. United Airlines, Inc*., 246 F.3d 878 (7th Cir. 2001) and *Stalter v. Wal-Mart Stores, Inc*., 195 F.3d 285 (7th Cir. 1999) is misplaced. (Resp. at 11-12.) In *Gordon*, there was only one other time that an employee was deemed to have violated the policy at issue. Worse, that one other comparable employee was not terminated and was outside the protected group. *Id*. at 892. Here, there were at least three (3) others who engaged in similar conduct, all were terminated, at least two were outside the protected group and Plaintiff presents no evidence that there were not others. Thus, the policy at issue here is neither rarely invoked nor inconsistently applied. There were other distinguishing factors in *Gordon* as well, e.g., shifting explanations for the termination decision, which is in sharp contrast to Michell's unwavering statement of his reasons for his decision.

In *Stalter,* the plaintiff was terminated for the "theft" of chips, where the co-worker stated that, "The next night he came up to me and did apologize and offered to buy me another bag or coffee, but I said no, for him to just forget about it." *Stalter*, 195 F.3d at 287. There also was evidence that food left on the countertop in the break room was considered abandoned and fair game for anyone who wished to eat it. *Id*. at 290. While Wal-Mart identified seven individuals who were terminated for theft, it failed to present evidence of what those employees stole. *Id*. Thus, unsurprisingly, Wal-Mart failed to present evidence of others who had been fired for stealing a bag of chips – and offering to make "restitution" before being caught. Here, in contrast, Plaintiff's misconduct cannot be reasonably viewed as akin to eating a co-worker's bag of chips and then

offering to buy a replacement bag. Even if it were, in this case and unlike *Stalter,* others engaged in the same conduct and were terminated under the same policy.

In sum, Plaintiff fails to present evidence of pretext.

### B. Plaintiff Cannot Present Evidence that Whole Foods Retaliated Against Him.

Plaintiff makes three (3) retaliation claims – that he was retaliated against for complaining about safety issues, for complaining about discriminatory treatment, and for exercising FMLA rights. As those all fail for two (2) identical reasons and a third, very similar reason, those arguments are grouped, below.

#### 1. There is No Evidence of Retaliatory Motivation by the Decision-Makers.

Plaintiff fails to address the same fatal flaw as exists with his discrimination claim. The decision-maker was Michell. And there is no evidence that Michell had any retaliatory animus.

Even if one expands that inquiry to McGuigan, who supplied the information to Michell, no allegation is made that she had any retaliatory animus.

Therefore, Plaintiff's "cat's paw" allegations (Resp. at 23) fail here, for the same reasons that they fail regarding the discrimination claim, discussed above.

#### 2. There is No Evidence of Retaliatory Motivation by Malicoat or Gaughan, Because Timing Alone is Insufficient to Sustain a Retaliation Claim.

The only alleged evidence of retaliatory motivation against Malicoat and/or Gaughan is the timing of Plaintiff's alleged protected conduct and the adverse action. Yet, the case law is well developed that timing alone is insufficient to sustain a retaliation claim. *See Galvan v. Indiana*, 117 F.4th 935, 947 (7th Cir. 2024) (holding that the district court properly granted summary judgment on plaintiff's retaliation claim because the record did not support any causal connection

where plaintiff relied on suspicious timing, and suspicious timing is generally insufficient to establish retaliatory motivation).

Thus, even if Malicoat and/or Gaughan were decision-makers, there is insufficient evidence to sustain any of Plaintiff's retaliation claims.

### 3. Plaintiff Fails to Even Present a Coherent Timeline of Adverse Actions Shortly After Protected Conduct.

Plaintiff also fails to present any plausible story of suspiciously-timed adverse actions. Once again, Plaintiff's Response misstates the evidence.

#### a. Safety Complaints.

Plaintiff's allegations of suspicious timing regarding his safety complaints are misplaced. (Resp. at 21.) First, Plaintiff fails to provide clarity on when these alleged complaints began. Plaintiff alleges that, "Starting around September 23, 2022, Plaintiff raised safety concerns . . . (Pl.'s SOF ¶6.) Yet, while Plaintiff cites evidence that he made a complaint at that time, nothing he cites suggests that this was his first complaint. Indeed, he alleges in his Complaint that his first such allegation was in July 2022. (*See* Def. Ex. F, Plf. Second Amended Answers and Objections to Defendant's Interrogatories, Dkt. 1, Complaint ¶28.)

Second, Plaintiff is similarly evasive on the alleged timing of allegedly retaliatory conduct. Contrary to Plaintiff's assertion, the cited evidence does not suggest that Malicoat "labeled" Plaintiff resistant to feedback and change at the time he raised a safety issue. (Pl.'s SOF ¶11.) Rather, the cited testimony has Malicoat explaining an incident where she called a meeting and that ". . . he started raising his voice at me, and just, basically, shutting everything down without any possible solutions." (Def.'s Resp. to Pl.'s SOF ¶11, Pl. Ex. 1, Malicoat Dep. 170:11-13.) Plaintiff does not deny raising his voice at his boss's boss, in front of others, so it is unsurprising that she did not like that. Yet, she did not discipline him or take any action to "label" him.

Nor is it accurate to say that this was the first time Plaintiff was viewed as difficult in his interpersonal communications. The one thing Plaintiff is criticized for the most in his performance appraisal of June 2022, before he made any alleged safety complaints, is his interpersonal interactions. He received his lowest scores in "motivation and attitude," "communicates effectively," and "following policies and procedures." (SOF ¶¶13-14; Def. Ex. A, Plf. Dep. Exh. 15, WFM_0000343-349.) The first two of these pertained to his prickly approach to communication, as can be seen by the comments in those sections.

Thus, Plaintiff was criticized for his interpersonal interactions before and after he complained of safety issues. His termination was three months after the last complaint he identifies with purported temporal precision.

**b. Race Complaint.**

Plaintiff alleges that he accused Malicoat of discriminating against him based on his race in "November" of 2022. (Resp. at 21-22.) However, Plaintiff cites no sworn testimony to support this allegation that this alleged conversation happened in November, just his own Complaint.

Further, Plaintiff does not allege when in November this conversation took place, even in his unsworn Complaint, or otherwise. (Def.'s Resp. to Plf.'s SOF ¶14.) As such, Plaintiff's assertion that he was scheduled to work on one Saturday and received a warning when he did not show up cannot be deemed to be retaliatory, for the alleged accusation to Malicoat could have been after the November 19, 2022 date of the warning (in addition to the fact that the warning was issued by a different decision-maker and Plaintiff's assertions regarding that warning are otherwise factually unsupported – *see* page 10, above).

Even assuming such a conversation took place in November 2022, there is no allegation that Malicoat took any adverse action. Rather, approximately 30-60 days later (assuming the

alleged conversation with Malicoat took place sometime in November), she sought to speak with him, with no plan of discipline, regarding workplace issues. There is no pattern or repeatedly berating him, no pattern of discipline – just an attempt at one conversation.

Plaintiff alleges that Gaughan reviewed video footage that same day, when Plaintiff had already left for the day such that the planned conversation did not occur. Gaughan reviewed the video footage to examine Plaintiff's conduct on two of the issues planned for discussion (not taking a lunch break and clocking out early). Further, Plaintiff had clocked out early that very day at 1:09 p.m. (as is discussed above, Plaintiff asserts without evidence that he did not clock out early that day, but in any event, Plaintiff does not deny that the Plaintiff's regular end-time was 1:30 p.m., after 1:09 p.m., nor does Plaintiff deny that he had clocked out early on other days when he took no lunch break). There is no evidence that Gaughan's decision to review the video footage was triggered by anything other than the fact that Plaintiff had left for the day, when they were looking for him to have a discussion of these issues, as opposed to an alleged conversation between Plaintiff and Malicoat 30-60 days earlier. The timing is unsuspicious, even without the factual context.

**c. FMLA Leave.**

In alleging retaliation for taking FMLA leave (Resp. at 22), Plaintiff points out that he took FMLA leave December 12-16, 2022, but he cannot overcome the fact that he also took FMLA leave in 2017, 2018, 2019 – 2020 and intermittently throughout 2022. (SOF ¶70.) Plaintiff cannot offer any reason why the Court should be suspicious of Malicoat reaching out for a discussion after Plaintiff's fifth FMLA leave, when there is no allegation of retaliation for the first four FMLA leaves. Similarly, Malicoat's supervision of Plaintiff began in late-2021, yet no retaliatory action is alleged for Plaintiff's intermittent FMLA leave throughout 2022 prior to December 28, 2022,

and the only alleged retaliation at that time is one attempt to have a conversation, which in turn led to discovery of misconduct.

To get around this, Plaintiff alleges that his intermittent FMLA leave throughout 2022 was taken in increments of two days or less, while he took a five-day increment during a busy time in December 2022. (Pl.'s SOF ¶16.) Yet, Plaintiff presents no evidence that there were issues created by his one-week absence. FMLA leave can be for up to 12 consecutive weeks, so a five-day absence cannot be assumed to cause retaliatory animus when a number of absences of two days or less obviously did not. Plaintiff also alleges, without evidence, that there was a meeting "approximately two weeks" before Plaintiff's termination (Resp. at 3, 22), but this again is a misrepresentation of the evidence. In the cited testimony, Malicoat states that the meeting could have occurred "[t]wo weeks or less. I don't know the time frame." The contemporaneous email shows that the meeting occurred on or near December 28, 2022. (Def.'s Resp. to Pl.'s SOF ¶17.)

In sum: Plaintiff utterly fails to point to any suspicious chronology; a suspicious chronology alone would be insufficient to sustain a retaliation claim; and even a suspicious chronology plus additional evidence would be insufficient where there is no evidence of retaliatory motivation by the decision-maker.

## III. CONCLUSION

Plaintiff fails to cite any evidence that the decision-maker's sworn statement, that he viewed Plaintiff's conduct as misrepresentation of time worked, is pretextual, or that he had any unlawful motivation. Every other employee who was identified as having done what Plaintiff did was terminated. Even those others Plaintiff alleges as comparables were unknown to the decision-maker. Summary judgment is warranted in this matter.

## CERTIFICATE OF SERVICE

I, Maria Palivos, an attorney, certify that on February 27, 2026, I caused a true and correct copy of the foregoing document to be filed electronically with the Clerk of the Court, using the Court's CM/ECF system, which served a copy upon the following counsel of record:

Thalia Pacheco
Heidi Sleper
Workplace Law Partners, P.C.
155 N. Michigan Ave., Suite 719
Chicago, IL 60601
tpacheco@fishlawfirm.com
hsleper@fishlawfirm.com
docketing@fishlawfirm.com

*Attorneys for Plaintiff*

*/s/ Maria Palivos*
Maria Palivos