UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JEVON PEOPLES,<br><br>Plaintiff,<br><br>v.<br><br>WHOLE FOODS MARKET, INC.,<br><br>Defendant. | No. 23 C 04359<br><br>Judge Thomas M. Durkin |

## MEMORANDUM OPINION AND ORDER

Jevon Peoples sues his former employer, Whole Foods Market, Inc. ("Whole Foods"), alleging he was terminated due to racial discrimination and in retaliation for complaining about discrimination, reporting unsafe working conditions, and exercising his rights under the Family Medical Leave Act. R. 1. Whole Foods moves for summary judgment. R. 68. For the following reasons, that motion is granted.

## Background

Peoples is an African American man who began working for Whole Foods in 2004 as a cashier. R. 85 ¶¶ 1–2. He was eventually promoted to Store Receiver in 2007, and then Lead Store Receiver in 2016. *Id.* ¶¶ 3–4. As Lead Store Receiver, Peoples was responsible for managing the receiving department of his assigned store, handling shipments, maintaining product integrity, and managing perishable goods. *Id.* ¶ 5. In 2018, he was transferred to the Gold Coast location where he continued his role as the Lead Store Receiver. *Id.* ¶ 6. Under Peoples's leadership, the Receiving

Department at the Gold Coast store was successful and consistently passed regional audits. R. 86 ¶ 1.

While Peoples generally received positive feedback regarding his work, multiple supervisors raised that he had issues with lateness and scheduling, and that he needed to work on better expressing his opinions and frustrations because he could come off as "negative" and "abrasive." R. 85 ¶¶ 10, 12–14; R. 86 ¶¶ 2, 5. Throughout the course of Peoples's employment at Whole Foods, he received numerous Counseling Statements and/or Unsatisfactory Work Warnings for being late or absent. R. 85 ¶¶ 9, 11.

In late 2021, Kristina Malicoat ("Malicoat"), who is Caucasian, became the Store Team Leader at the Gold Coast location. R. 1 ¶ 25; R. 85 ¶ 7. After that, Frank Gaughan ("Gaughan") became one of the Associate Store Team Leaders at the Gold Coast location. R. 85 ¶ 7. Gaughan generally supervised Peoples and reported to Malicoat. *Id.*

In September of 2022, Peoples raised safety concerns to Malicoat regarding where chemicals were stored, how pallets were staged, and air quality due to construction. R. 86 ¶ 6; R. 85 ¶¶ 72–73. Malicoat conferred with a regional receiving employee and was informed that the pallets were not a safety issue. R. 86 ¶ 8. Whole Foods ordered equipment to address the air quality issue. R. 85 ¶ 73. Malicoat felt that Peoples disliked change, and she believed that he would complain that any changes were "safety" issues to justify his opposition. R. 86 ¶ 9.

In November of 2022, Peoples complained to Gaughan that Malicoat did not like him and he "fe[lt] differential treatment." R. 86 ¶ 14; R. 70 Ex. A at 74:1–9. Gaughan advised him to work it out with Malicoat directly. R. 86 ¶ 14. Peoples approached Malicoat and said he felt like she was mistreating him because he was an African American man in a lead role. *Id.* Malicoat responded that she didn't like him because he's a negative person. *Id.*

During his employment, Peoples took leave under the Family Leave Medical Act ("FMLA") for his daughter's medical condition intermittently within various time periods: from May 2017 to September 2017; from March 2018 to November 2018; from October 2019 to February 2020; and throughout 2022, including the week of December 12–16, 2022. R. 85 ¶ 70; R. 70 Ex. A at 165:1–166:4. The record does not reflect how often Peoples took consecutive days of leave within these time periods, but it is undisputed that December 12–16, 2022 was the first time Peoples took leave for more than two consecutive days while Malicoat was Store Team Leader, and the leave occurred during a "blackout period," which is a period of two weeks before a holiday like Thanksgiving or Christmas when vacation time is limited. R. 86 ¶ 16; R. 82 at 234:15–235:1.

Sometime in December of 2022, Malicoat, Gaughan, and another Associate Store Team Leader met to discuss Peoples, particularly that he was not taking his mandatory lunch break. R. 86 ¶ 17. They determined that he should participate in retraining. *Id.* On December 28, 2022, Malicoat sent four emails to Team Member Services and store leadership raising complaints regarding Peoples's performance,

which included allegations that he was: leaving early and skipping lunches, resistant to change, burning incense on the receiving dock, and not wearing non-slip shoes. *Id.* ¶ 18. That afternoon, Gaughan and Malicoat wanted to speak with Peoples about these issues. R. 85 ¶¶ 16–17.

When Gaughan and Malicoat looked for Peoples, they discovered he had already clocked out for the day at 1:09 pm. *Id.* ¶ 18. Peoples typically worked from 5:00 am to 1:30 pm.[1] *Id.* ¶ 71. Gaughan looked through Peoples's timesheet and noticed that he had not clocked out for lunch all week. *Id.* ¶ 19. Gaughan then checked security camera footage and determined that Peoples clocked in that morning at 5:07 am and then immediately left the building at 5:09 am. *Id.* ¶¶ 19–20; R. 70 Ex. B ¶ 4, Ex. B-3. Eight minutes later, Plaintiff reentered the building through a different door and was newly carrying a backpack. R. 85 ¶ 20. Gaughan watched more security footage to determine if Peoples had done this on other occasions. *Id.* ¶ 21. He determined that over the preceding month, Peoples clocked in, left the building, and returned anywhere from six to twenty-two minutes later nearly every shift that he worked. *Id.* ¶ 21–22; R. 70 Ex. B-3. On four of the occasions, at least fifteen minutes passed from when People left the building to when he returned. R. 85 ¶ 23.

That same day, Gaughan prepared a summary of his findings and emailed them to Molly McGuigan ("McGuigan") in human resources. *Id.* ¶ 24. In this email,

[1] It is disputed whether Peoples clocked out early on December 28, 2026. He contends that his shift ended that day at 1:00 pm. Whole Foods contends that his shift ended at the typical time of 1:30 pm. Regardless, because it is undisputed that Peoples typically worked until 1:30 pm, there was reason for Gaughan to believe that Peoples was scheduled to work until 1:30 pm that day. R. 85 ¶ 18–19.

Gaughan raised terminating Peoples due to misrepresentation of time. *Id.* ¶ 26; R. 70 Ex. B-1. Whole Foods's General Information Guide ("Guide") lists several "major infractions," which are "[e]xamples of conduct that may lead to discharge," including "misrepresentation of time worked." R. 85 ¶ 32. The Guide further states that "[p]aid rest breaks may not be added onto the beginning or end of the shift to leave early or arrive late" and "[p]aid rest breaks should be taken approximately in the middle of each major portion of work to promote safety and productivity." *Id.* ¶ 33. Violations of these provisions are not listed under "major infractions." *Id.*

The following day, December 29, 2022, McGuigan met with Peoples regarding Gaughan's findings. *Id.* ¶ 28. During that meeting, Peoples admitted that he had been driving up, clocking in, going back to his car, parking it at the employee-parking garage, and then going to work, and that he had been doing so for several months. *Id.* McGuigan asked Peoples why he did this, and Peoples responded that it was because he was running late. *Id.* When asked why he was running late, Peoples said, "personal reasons." *Id.* Peoples stated that he received a couple parking violations and tickets for parking his car outside the front of Whole Foods. *Id.*

Shortly thereafter, McGuigan emailed Team Member Services Team Leader James Michell ("Michell"), who was one-step above McGuigan on the human resources hierarchy, recapping her conversation with Peoples. *Id.* ¶¶ 30–31. Michell supported various stores as the human resources business partner leader, and on December 29, 2022, Michell supported the Gold Coast location. *Id.* ¶ 30. Michell did not know who Peoples was at the time and does not recall any interactions or dealings

with Peoples prior to this incident. *Id.* ¶ 43. Similarly, Peoples did not know who Michell was and never interacted with him. *Id.* ¶ 44.

Michell followed up with McGuigan on December 29, 2022, by telephone. *Id.* ¶ 35. After conferring with McGuigan, Michell made the decision to terminate Peoples's employment because he had engaged in misrepresentation of time worked, and had done so on a number of occasions. *Id.* ¶ 37. Michell did not speak to Malicoat regarding his decision to terminate Plaintiff's employment. R. 85 ¶ 47. On December 30, 2022, Gaughan called Peoples to inform him that he was terminated due to "abuse of time." *Id.* ¶ 49.

Peoples filed suit on July 6, 2023, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e et seq., ("Title VII"), the Illinois Human Rights Act, 775 ILCS 5/2-101 et seq. ("IHRA"), and the Family and Medical Leave Act, 29 U.S.C. Sec. 2601 *et seq.* ("FMLA"). R. 1. Peoples claims that Whole Foods discriminated against him based on his race when it terminated him, and that Whole Foods terminated him in retaliation for complaining about race discrimination, complaining about unsafe working conditions, and using his FMLA leave. *Id.* Whole Foods moves for summary judgment. R. 68.

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there

is a genuine issue for trial." *Johnson v. Advoc. Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Discussion

I. Discrimination

Plaintiff alleges that Whole Foods discriminated against him on the basis of his race by firing him in violation of Title VII and the IHRA. Title VII makes it unlawful for an employer to discriminate against any individual with respect to his "compensation, terms, conditions, or privileges of employment" because of his race. 42 U.S.C. § 2000e-2(a)(1). The IHRA makes it unlawful for an employer discipline or discharge an individual "on the basis of unlawful discrimination." 775 ILCS 5/2-102(A). Because discrimination claims under Title VII and the IHRA are analyzed under the same framework, the Court considers these claims concomitantly. *See Wilson v. AIM Specialty Health*, 176 F.4th 977, 983 (7th Cir. 2026).

When a plaintiff alleges that he was fired because of racial discrimination, the question "is simply whether the evidence would permit a reasonable factfinder to

conclude that the plaintiff's race . . . caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). As to Peoples's discrimination claim, the Court finds that the answer is no.

Here, Whole Foods took an adverse employment action against Peoples by firing him, but the factual record shows that Peoples was fired for regularly misrepresenting the amount of time he worked by clocking in before parking his car and returning to work. Peoples admits that he was engaging in this conduct, that he did so repeatedly, and that it was because he was running late. Further, the record reveals multiple other Whole Foods employees of various races who were fired for substantially the same reason. Peoples's arguments to the contrary are unsupported—and often contradicted—by the facts. Therefore, summary judgment is warranted.

Peoples argues that the following evidence, when taken together, supports an inference of discriminatory intent: (1) hostile treatment by Malicoat; (2) exaggerated characterizations of his conduct; (3) selective and unusually harsh enforcement of a timekeeping rule; and (4) disputed comparator evidence. R. 73 at p. 7; *see Ortiz*, 834 F.3d at 765 ("Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself . . . ."). The factual record, however, does not substantiate Peoples's arguments.

Peoples's argument that Malicoat was hostile to him fails for three reasons: first, there is insufficient evidence that Malicoat was hostile in an actionable manner;

second, he has not established that any purported treatment was racially motivated; and third, Malicoat did not make the decision to fire him.

Peoples points to scant evidence of hostile treatment by Malicoat. Peoples testified that Malicoat did not thank the Receiving Department during a speech at a ceremony for the opening of the new Gold Coast store location in April 2022. R. 86 ¶ 12. He also testified that Malicoat did not invite him to monthly Team Leader Meetings despite the meetings being held outside of his typical working hours.[2] R. 85 ¶ 71. After Plaintiff raised safety issues in September of 2022, Malicoat believed that he disliked change and was using false concerns about safety as a means of legitimizing his complaints. R. 86 ¶ 9. This did not lead to any disciplinary action. *See id.* ¶ 37; R. 85 ¶ 64. These allegations are insufficient to conclude that Peoples was treated with hostility, let alone that any alleged hostility was racially discriminatory.[3]

In November 2022, Peoples complained to Gaughan that Malicoat did not like him and Gaughan advised him to work it out with Malicoat directly. R. 86 ¶ 14.

[2] Monthly Team Leader Meetings were typically held at 2:00 pm, and Peoples's shift ended at 1:30 pm. R. 85 ¶ 71. Malicoat testified that when they first moved to the new store location she invited him to the Team Leader Meetings and encouraged him to attend, even just for the first few minutes. R. 82 at 166:12–19. Peoples contends that Malicoat only told him he was included after a few months had passed and he asked her why he wasn't included. R. 70 Ex. A at 49:3–15.

[3] Peoples claims that in response to an anonymous survey from Whole Foods's headquarters he complained about the lack of African American leadership at the Gold Coast store. R. 85 ¶ 68. But he does not allege or provide evidence that Malicoat had anything to do with this, nor that there was discrimination in any of the leadership hirings. At the Gold Coast store, there were four White/non-Hispanic, five Hispanic, and two African American team leaders. R. 82 at 33:8–35:23.

Peoples did not tell Gaughan that he thought race was an issue with Malicoat, but rather told him, "I didn't think she liked me very much." R. 70 Ex. A at 74:10–15. Peoples then approached Malicoat and said he felt like she was mistreating him because he was an African American man in a lead role. R. 86 ¶ 14. Malicoat responded that she didn't like him because he's a negative person. *Id.*; R. 70 Ex. A at 76:14–17. While Malicoat's response evinces a personal dislike of Peoples, Peoples has not established a reasonable basis to conclude that her dislike was racially motivated. *See Hoosier v. Greenwood Hosp. Mgmt. LLC*, 32 F. Supp. 3d 966, 976–77 (N.D. Ill. 2014) ("[A] plaintiff's bare or conclusory assertion that an employer mistreated her because of her protected status is not sufficient to establish a link between [an] employee's protected status and the treatment she received. . . . The Seventh Circuit repeatedly has held that isolated comments by a supervisor that may be inappropriate and offensive do not rise to a level that is sufficient to support a claim of discrimination or harassment."); *Hill v. St. James Hosp. & Health Ctrs.*, No. 10 C 5780, 2013 WL 593954, at *6 (N.D. Ill. Feb. 15, 2013) (explaining that a plaintiff's "feel[ing] that there was a difference in how she was being treated because of her race . . . without more does not create a triable issue as to whether . . . defendant's actions were motivated by racial animus" because "[i]f it did, every plaintiff who claims to have a subjective feeling of being discriminated against could escape summary judgment, even if those feelings were entirely unsubstantiated by facts").

And even if Malicoat's dislike was racially motivated, that still would not support that Peoples's firing was discriminatory, because she was not involved in the firing decision. *See Harris v. Warrick Cnty. Sheriff's Dep't*, 666 F.3d 444, 448 (7th Cir. 2012) ("To prove employment discrimination, a plaintiff needs direct or circumstantial evidence 'that the decisionmaker has acted for a prohibited reason.'" (quoting *Rogers v. City of Chi.*, 320 F.3d 748, 754 (7th Cir. 2003))). Although Michell made the termination decision, Peoples argues that Malicoat was the proximate cause of his firing under the "cat's paw" doctrine. Under this doctrine, Malicoat could be held responsible for Peoples's termination if it was the intended and foreseeable consequence of her discriminatory conduct. *See Huff v. Buttigieg*, 42 F.4th 638, 647 (7th Cir. 2022). It's true that Malicoat attempting to meet with Peoples on December 28, 2022, ultimately set in motion the events that would lead to Peoples's termination. However, there is no indication that was Malicoat's intention when setting the meeting, nor that his termination was foreseeable; Peoples was not terminated or even disciplined based on any of the issues that Malicoat raised in her email. *See* R. 86 ¶ 37. Upon discovering that Peoples had already clocked out for the day, Gaughan on his own initiative reviewed People's timesheets and security camera footage. R. 85 ¶ 19; R. 70 Ex. B ¶ 4. He alerted McGuigan in HR that Peoples was regularly clocking in before leaving to park his car. R. 85 ¶¶ 24, 27. McGuigan spoke with Peoples, who confirmed Gaughan's findings. *Id.* ¶ 28. McGuigan then informed Michell, and Michell ultimately made the termination decision. *Id.* ¶¶ 30–31, 35, 37–38. There is no evidence that Malicoat participated in these conversations, provided information

that was pertinent to these conversations, or had the intention of firing Peoples. A cat's paw claim "can survive only when there is a factual basis in the record for the assertion that the biased individual's prejudice was the motivation for the decision-maker's actions." *Schreiner v. Caterpillar, Inc.*, 250 F.3d 1096, 1100 (7th Cir. 2001). That factual basis is wholly absent here. Therefore, Peoples has not reasonably established that his termination was based on his race.

Peoples's next argument that his conduct was "exaggerated" into a "major infraction" similarly has no basis in the record. R. 73 at p. 15. Peoples repeatedly asserts that he was taking his allotted 10-minute break right after clocking in, which is not listed as a "major infraction" in the Guide, and therefore it should have been handled with progressive discipline rather than firing. *Id.* at pp. 10–11. While Peoples concedes that the Guide prohibits taking a break at the beginning of a shift, he argues that the Guide does not define when a shift "begins" nor how long one must work before taking a break. *Id.* at p. 10. This argument strains credulity. Clocking in and immediately taking a break is indisputably taking a break at the beginning of a shift. *See* R. 81 Ex. 9 at Guide p. 24 ("Paid rest breaks should be taken approximately in the middle of each major portion of work to promote safety and productivity."); *see also* R. 70 Ex. B-3 (noting that the majority of the time Peoples left the building 2–3 minutes after clocking in).

Regardless, Whole Foods maintains that Peoples was fired for a "misrepresentation of time," not for taking his break early. And "misrepresentation of time" is listed as a major infraction in the Guide that "may lead to discharge." R.

85 ¶ 32. Peoples readily admitted both when questioned by McGuigan and during his deposition that he would leave to park his car on multiple occasions right after clocking in because he was running late. R. 85 ¶¶ 28–29; R. 70 Ex. C ¶ 6 ("Mr. Peoples admitted . . . that he had been driving up, clocking in, going back to his car, parking it at the employee-parking garage, and then going to work, and that he had been doing so for several months . . . because he was running late."); R. 70 Ex. A at 98:10–14 ("Q: So as I understand it, sometimes you drove up, clocked in, ran back to your car, and then the next thing you did was park your car; is that correct? A: Yes."). It is notable that Whole Foods has a seven-minute grace period whereby an employee is not considered late if he clocks in within seven minutes of his shift start time, R. 85 ¶ 8, and Peoples admitted he regularly utilized this grace period to clock in at exactly 5:07 before leaving to move his car. R. 70 Exs. B-3, C-2. This reinforces that Peoples was merely running late and trying to ensure he was clocked in on time for his shift.

Even if true that Peoples occasionally completed a few minutes of work before moving his car, his testimony and the video record support that that was not always the case. And furthermore, on four occasions in December of 2022, Peoples did not return to the building until more than fifteen minutes had passed. *See* R. 70 Ex. B-3. This means that, even drawing all reasonable inferences in favor of Peoples, he still was not adequately accounting for his time worked. Whole Foods determined from the video footage that Peoples was cumulatively outside of the building while on the clock for nearly three hours. R. 70 Ex. B-1. A reasonable factfinder would have no basis to find it discriminatory that an employee was fired for knowingly and

repeatedly mischaracterizing his time worked in violation of his employee handbook, particularly when that handbook specified that such violations may lead to discharge.

This is further bolstered by the fact that multiple other employees—of various races—have been fired for similar timekeeping violations, which belies Peoples's argument that the timekeeping policy was selectively enforced. Both Michell and McGuigan expressed that Whole Foods consistently terminated employees who committed timekeeping violations. R. 85 ¶¶ 42, 50; R. 70 Ex. D-2. And Michell has personally terminated multiple other employees for misrepresentations of time worked. R. 85 ¶ 40; R. 81 at 77:2–10. Indeed, a Hispanic employee was terminated in February 2023 for the exact same misrepresentation of time as Peoples: she was terminated after one instance of clocking in, leaving the building to park her car, and then returning to the building to work. R. 85 ¶ 52. A white employee was also terminated in Fall of 2022 for similar conduct. He "kept disappearing during his shift while on the clock" and was discovered to be in the breakroom on his phone for extended periods of time. *Id.* ¶ 51.

Peoples does not present any evidence that other employees engaged in misrepresentations of time and were not fired. Instead, Peoples names four employees—Carlos Celis, Misael Martinez, Arnold Cavazos, and Gloria Morales—who he alleges also took a break at the beginning of their shift and were not terminated. The problem is that Peoples has no support for this contention. In fact, he never saw anyone clock in and *immediately* go on break. R. 85 ¶ 53. Martinez testified that he never took a break immediately after clocking in for work; he took

his break at 9:30 a.m. or 10:00 a.m. when his shift started at 5:30 a.m. R. 70 Ex. H at 36:7–22. Cavazos did testify that he took a break "at the beginning of his shift," but clarified that he was referring to taking a break a couple hours after his shift started as "at the beginning of his shift." R. 70 Ex. G at 155:7–9, 156:2–20, 157:17–158:6. Gloria Morales and Carlos Celis did not provide testimony. Therefore, Peoples has not provided any support that other employees immediately took breaks and were not terminated, and he conceded he has no firsthand knowledge of the same.

Peoples also asserts that employees who were accused of sexual harassment or who did not properly store meat were not fired, but those allegations are both unsupported by the facts and inapposite. Racial discrimination may be inferred when an employer treats an African American employee less favorably than it treats a similarly-situated employee of another race, known as a comparator. *See de Lima Silva v. Dep't of Corr.*, 917 F.3d 546, 559 (7th Cir. 2019). To establish that others outside the plaintiff's protected class are adequate comparators, the plaintiff should at least show that the comparators "(1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012) (cleaned up). Although similarly situated employees "need not be identical in every conceivable way," they "must be 'directly comparable' to the plaintiff in all material respects." *Id.* at 846 (quoting *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 365–66 (7th Cir. 2009)). Allegations of harassment or improper food storage are not

materially comparable to deem these employees comparators. Notwithstanding, Peoples lacks support for his claims. While Peoples generally alleges he raised issues pertaining to meat storage, and that Walberton Colon was in charge of the Meat Department, he does not allege that he specifically saw Colon mishandle meat nor that leadership expressed concerns about meat storage.[4] Peoples also alleges that two employees[5] engaged in sexual harassment, but he has no firsthand knowledge to support his claims. R. 85 ¶ 59. Allegations of sexual harassment against the first employee are not substantiated.[6] The second employee resigned while being investigated for sexual harassment. *Id.* So, while the claim that Whole Foods did not fire him is technically true, it is possible that he would have been fired at the end of the investigation. Here, the adequate comparators are other individuals who misrepresented their time. Whole Foods has provided uncontested evidence that at least two comparators were fired, and Peoples has not provided any evidence that a comparator was not fired. This vitiates discriminatory intent.

In the alternative, Peoples argues that he has made a prima facie case of racial discrimination using the *McDonnell Douglas* burden-shifting framework. *See Wilson*, 176 F.4th at 983 (outlining that in the Seventh Circuit, "plaintiffs may choose to

---

[4] Peoples further concedes that Michell was unaware of any meat storage issues, and even if he had been, he testified that this would be treated with progressive discipline. R. 85 ¶ 61.

[5] The Court is not using the names of these employees so as not to reveal sealed information pertaining to their personnel history.

[6] Malicoat testified that the employee asked a woman on a date. Malicoat spoke with that woman, and she only asked that the employee be told not to ask her out again. R. 82 at 257:9–258:18. Malicoat spoke with the employee and he complied. *Id.*

present their evidence under either the [*Ortiz* or *McDonnell Douglas*] frameworks"). To establish a prima facie case of discrimination under this framework, a plaintiff must show that he (1) is a member of a protected class; (2) was meeting his employer's legitimate expectations; (3) suffered an adverse employment action; and (4) at least one similarly situated employee, not in his protected class, was treated more favorably. *See Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 979 (7th Cir. 2014); *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973). Once established, the employer then presents evidence of a non-discriminatory reason for its decision, and the burden ultimately shifts back to the plaintiff to establish that the employer's reason is pretextual. *Id.* At the summary judgment stage, a plaintiff is not required to prove the prima facie elements of his case; rather, a plaintiff need only show that there is a genuine issue of material fact regarding the elements. *See O'Neal v. City of New Albany*, 293 F.3d 998, 1003 (7th Cir. 2002).

Whole Foods does not challenge that Peoples is part of a protected class, nor that he experienced an adverse employment action when he was terminated.[7] But Whole Foods argues that there is no genuine dispute of material fact that Peoples was not meeting his legitimate job expectations because he admitted to

[7] Peoples also claims that he suffered an adverse employment action because his schedule was changed without notice, causing him to miss work on Saturday, November 19, 2022, which resulted in written discipline. R. 73 at p. 14. Whole Foods disputes that Peoples's schedule was changed and points to testimony by Peoples's former supervisor that Peoples dictated his own schedule. R. 78 Ex. 2 at 218:7–219:20. Whether or not this constituted an additional adverse employment action is immaterial because he does not establish the other elements of a prima facie case.

misrepresenting his time worked in violation of company policy.[8] *See Contreras v. Suncast Corp.*, 237 F.3d 756, 760–61 (7th Cir. 2001) (finding that compliance with company policies is a legitimate job expectation). And, as already explained, Peoples has failed to raise that a similarly situated employee was treated more favorably. For those reasons, Peoples's prima facie case fails.

At bottom, even assuming Peoples could somehow establish a prima facie case, Whole Foods has presented evidence that the termination was based on misrepresentations of time. No reasonable jury could find this reason pretextual when all of the evidence supports that any Whole Foods employee who misrepresents time—regardless of race—is terminated. Therefore, summary judgment is granted.

## II. Retaliation

Peoples argues that he was fired in retaliation for complaining about discriminatory treatment, for complaining about safety issues, and for exercising his FMLA rights. Peoples's retaliation claims do not survive summary judgment for the same reason as his discrimination claims—no reasonable factfinder could infer retaliatory intent.

---

[8] Even if the Court takes Peoples's claim as true that he was merely taking his ten-minute break after clocking in to move his car, there is still evidence that this break lasted at least fifteen minutes on four occasions. R. 70 Ex. B-3. On those occasions, Peoples was indisputably clocked in while outside of the building and not on a break. That constitutes a misrepresentation of time worked in violation of the Guide, and consequently a failure to meet his legitimate job expectations. *See Contreras*, 237 F.3d at 760–61 (finding that compliance with company policies is a legitimate job expectation).

Retaliation is established the same way under Title VII, the IHRA, and the FMLA: to prevail on a retaliation claim, Peoples must prove (1) he engaged in activity protected by the statute; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action. *Vavra v. Honeywell Int'l, Inc.*, 106 F.4th 702, 705 (7th Cir. 2024) (Title VII and IHRA); *Pagel v. TIN Inc.*, 695 F.3d 622, 631 (7th Cir. 2012) (FMLA). Much like discrimination, this can be established either through direct evidence or through the *McDonnell Douglas* burden-shifting approach. *See Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 896 (7th Cir. 2003) (Title VII); *Rongere v. City of Rockford*, 99 F.4th 1095, 1102–03 (7th Cir. 2024) (IHRA); *Pagel*, 695 F.3d at 631 (FMLA).

As previously discussed, Peoples cannot establish a prima facie case under the *McDonnell-Douglas* framework. *See Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179 (7th Cir. 1997) ("[Plaintiff] is out of luck if he can't show that he was meeting his employer's legitimate expectations").

Peoples also has not established any causal link between the protected activities and his termination. His arguments rest solely on timing, and that alone is not enough. *Jokich v. Rush Univ. Med. Ctr.*, 42 F.4th 626, 634 (7th Cir. 2022). That is particularly true when, as here, any "temporal proximity may be negated by an alternative explanation." *Id.* Moreover, Michell was unaware that Peoples had complained about discriminatory treatment and safety issues or that he took FMLA leave when Michell made the termination decision. R. 85 ¶ 46–47; *see also Mercil v. Federal Express Corp.*, 664 F. Supp. 315, 318 (N.D. Ill. 1987) (granting summary

judgment where plaintiff failed to show that decisionmakers knew of alleged protected activity).

And because he has not established causation, his retaliatory discharge claim also fails. *See Putnam v. CaramelCrisp, LLC*, 186 F.4th 898, 908 (7th Cir. 2026) (explaining that retaliatory discharge has a "high[] causation standard"—a plaintiff would have to prove that he was terminated solely "*because* of" his complaints (quoting *Matros v. Commonwealth Edison Co.*, 434 Ill.Dec. 335, 136 N.E.3d 83, 107 (Ill. App. Ct. 2019))).

Peoples has not provided evidence that would permit a reasonable factfinder to determine that his firing was retaliatory. Therefore, summary judgment is granted.

**Conclusion**

For the foregoing reasons, the Court grants Whole Foods's motion for summary judgment.

ENTERED:

Thomas M Durkin

Honorable Thomas M. Durkin
United States District Judge

Dated: October 8, 2026